WEST INDIES, INC., a Corporation, Appellant, *v.*
  FIRST NATIONAL BANK OF NEVADA, a Cor-
  poration, as Administrator of the Estate of
  LEONARD ·H. WOLFF, Deceased, Respondent.

No. 3581

January 17, 1950.                    214 P.2d 144.

14

*Royal A. Stewart,* of Reno, for Appellant.

*John S. Belford,* of Reno, for Respondent.

## OPINION

By the Court, PRIEST, District Judge:

This is an appeal from a final judgment of dismissal of an action commenced in the Second judicial district court of Washoe County, after issue joined on the pleadings. Appellant was plaintiff and respondent was defendant in the trial court.

The complaint alleges that on October 23, 1948, decedent Leonard H. Wolff, drew three checks upon respondent in the respective amounts of $7,000; $29,000; and $50,000, and sets out the checks *in haec verba,* and alleges that same were presented to respondent for payment on October 24, 1948, and dishonored; that Leonard H. Wolff died testate on October 23, 1948; that on November 22, 1948, the respondent was appointed by the Second judicial district court, administrator, *cum testamento annexo,* and on said date qualified, and is now qualified and acting as such administrator of the estate of the said Leonard H. Wolff; that on February 15, 1949, the appellant duly presented its claim to said administrator for the sums set out in said checks totaling $86,000, which claim was rejected and refused of February 16, 1949, by an instrument in writing. Plaintiff prayed for judgment against the defendant as administrator of the estate of Leonard H. Wolff, in the sum of $86,000 and for costs of suit, payable out of said estate in due course of administration.

Respondent answered and set up as an affirmative defense that the said checks had been given by decedent to plaintiff in payment of money theretofore won by plaintiff from defendant at the gambling game of "twenty one" and for no other purpose and that the sole consideration for the execution and delivery thereof was money theretofore won by plaintiff from decedent at said gambling game.

Plaintiff's reply admitted the allegations of the affirmative defense heretofore set out. Subsequent to the filing of its reply the plaintiff moved the court for

an order permitting an amendment to the reply in such a manner as to show that at all times material to the action, appellant was regularly licensed by state authorities as by law provided and required, to operate the said game referred to. Without objection this proposed amendment was allowed.

Defendant then moved the court for the entry of judgment on the pleadings dismissing the action, upon the ground that if said checks were so executed and delivered, they were executed upon the sole consideration of money won at gambling. Upon stipulation of counsel the motion to dismiss was heard by Hon. Merwyn H. Brown, judge of the Sixth judicial district court. Upon presentation and argument the court entered an order granting the motion for judgment on the pleadings and accordingly entered judgment for defendant. From the judgment of dismissal plaintiff appeals.

At the argument herein counsel for the respective sides mentioned possible distinctions between actions based upon the checks or based upon the alleged indebtedness or otherwise founded, but upon being asked by the court whether or not it was the desire of counsel that the opinion should pass squarely upon the point of collectibility by the gambling establishment of money won at a duly licensed game, each replied that he would like the opinion to determine squarely such question. There is therefore the one question presented here to this court, viz: May a gambling house or the proprietor thereof maintain an action at law for the collection of money won at a duly licensed game? We have thus limited the inquiry and have omitted from this determination the question of collectibility of money by a patron of winnings from a duly licensed game. Such question is not presented here.

Appellant contends: That the earlier decisions of this court are not controlling, being decided under other statutes declaratory of a different public policy; that the English common law, if adopted by Nevada, has been

altered by statute; that since 1909 the public policy of this state has been substantially altered with reference to gambling; that licensed gambling is no longer a public nuisance or contrary to public policy, and that our gambling enactments are repugnant to the English statutes.

Respondent contends: That a portion of the common law known as the Statute of Anne, 9 Anne, c. 14, 4 Bac.Abr. 456, relevant to gambling has been effectually adopted by this state; that if not effectually adopted heretofore it is nevertheless an integral part of the law of this state; that the statute is severable and the adoption of a pertinent part is not dependent upon the adoption of the whole; that the law does distinguish in its regulatory power between useful callings and those that do not contribute to the economic good; that the statute is prohibitive rather than permissive; that an express clause in the act making such accounts collectible would have been ineffectual in the absence of a change of title; and that the social consequences of a change in the recognized law are great and that an intent to repeal by implication should not be imputed to the legislature in the absence of a clear showing.

The first pronouncement of this court upon this question was in Scott v. Courtney, 1872, 7 Nev. 419, in which case the court construed the statute of 1869, p. 119. From this statute we quote sections 1, 3, and 5.

"Section 1. Each and every person who shall deal, play, carry on, open, or cause to be opened, or who shall conduct, either as owner or employe, whether for hire or not, except under a license as hereinafter provided, any game of faro, monte, roulette, lansquenette, rouge et noir, rondo or any banking game played with cards, dice, or any other device, whether the same be played for money, checks, credit, or any other representative of value, shall be guilty of a misdemeanor, and on conviction thereof, shall be punished by a fine of not less than one thousand, nor more than three thousand dollars, or by imprisonment in the County Jail not less

than three months nor more than one year, or by both such fine and imprisonment.

"Sec. 3. Blank licenses shall be prepared by the County Auditor, which shall be signed, issued and accounted for, as is by law provided in respect to other county licenses. Each license delivered by the Sheriff, under this Act to any person, shall contain the name of the licensee, a particular description of the room in which the licensee desires to carry on the game licensed, and shall by its terms authorize the licensee to carry on one of the games mentioned in the first section of this Act, specifying it by name, in the room therein described, for the period of three months next succeeding the date of issuance of the license. The said license shall protect the licensee and his employer or employers[1] against any criminal prosecution for dealing or carrying on the game mentioned in the room described during said three months, but not for dealing or carrying on any other game than that specified, or the specified game in any other place than the room so described; provided, that the licensee shall be entitled to deal, or play, or carry on two or more games in the same room, by paying a license for each game so dealt or carried on.

"Sec. 5. All moneys received for licenses under the provisions of this Act, shall be paid, one half into the County Treasury and one half into the State Treasury, for general county and State purposes respectively."

In Scott v. Courtney, supra, suit was brought by the proprietor of a duly licensed game to collect money lost at such game. Without a declaration that Nevada had adopted any portion of the common law of England known as the Statute of Anne, heretofore referred to, for it appears that the question was never raised, the court nevertheless concluded, in reliance principally upon decisions of the state courts under similar statutes, that the so-called indebtedness was not collectible and that the action could not be maintained. The immunity clause in the statute, i. e., the declaration in section 3,

---

[1] Employee or employees.

that "the said license shall protect the licensee and his employer or employers against any criminal prosecution for dealing and carrying on the game mentioned," did obviously have certain and considerable persuasive force in leading the court to the conclusion that the license was by the statute limited and losses at such games were not collectible. This immunity feature of the law will be later discussed. The court said:

"In the United States, wagering and gaming contracts seem to have met with no countenance from the courts, and consequently in nearly every state they are held illegal, as being inconsistent with the interests of the community and at variance with the laws of morality. 2 Smith's Leading Cases, 343."

Section 9021 N.C.L. of 1929, provides as follows: "The common law of England, so far as it is not repugnant to, or in conflict with the constitution and laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all the courts in this state." This has been held to include the English statutes in force at the time of the American Declaration of Independence. Ex parte Blanchard, 9 Nev. 101.

The next enactment of the Nevada legislature, affecting gambling was passed in 1879, Statutes of Nevada 1879, p. 114, and is entitled: "An Act to Restrict Gaming, and to repeal all other Acts in relation thereto." From this statute we quote sections 1, 3, and 5.

"Section 1. Each and every person who shall deal, play, carry on, open, or cause to be opened, or who shall conduct, either as owner or employee, whether for hire or not, except under a license, as hereinafter provided, any game of faro, monte, roulette, lansquenette, rouge-et-noir, rondo, keno, fantan, twenty-one, red-white-and-blue, red-and-black or diana,  *  *  *  or any banking percentage game, played with cards, dice or any other device, whether the same be played for money, checks, credit, or any other valuable thing or representative of value, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than

one thousand nor more than three thousand dollars, or by imprisonment in the county jail not less than three months nor more than one year, or by both such fine and imprisonment.

"Sec. 3. Blank licenses shall be prepared by the County Auditor, which shall be issued and accounted for as is by law provided in respect to other county licenses. Each license delivered by the Sheriff under this Act to any person shall contain the name of the licensee, a particular description of the room in which the licensee desires to carry on the game license, and shall by its terms authorize the licensee to carry on one of the games mentioned in the first section of this Act, specifying it by name in the room therein described, for the period of one month next succeeding the date of issuance of the license. The said license shall protect the licensee and his employer or employers against any criminal prosecution for dealing or carrying on the game mentioned in the room described during said one month, but not for dealing or carrying on any other game than that specified, or the specified game in any other place than the room so described; provided, that the licensee shall be entitled to deal or play, or carry on two or more games in the same room, by paying a license for each game so dealt or carried on.

"Sec. 5. All moneys received for licenses under the provisions of this Act shall be paid, three-quarters into the county treasury, and one-quarter into the state treasury, for general county and state purposes respectively."

In Evans v. Cook, 11 Nev. 69, decided in 1876, and hence decided under the statute of 1869, defendant was sued under his statutory undertaking, posted to prevent levy of attachment upon one Hanley. Under the statutory undertaking, after collusive judgment against Hanley, who was totally insolvent, Evans brought suit against Cook and one Polleys. Polleys filed a demurrer. Cook having been deceived by Hanley, who had represented to Cook that he would defend and set up the defense that the entire consideration was a gambling

debt, allowed default to be taken against him. Before judgment Cook then moved the court for an order to set aside the default and for leave to defend on the merits, the motion being based upon the theory of excusable neglect. The affidavit in support of the motion to set aside the default on the ground of excusable neglect was unopposed, was filed before judgment, was comprehensive, and did effectually set up the fact of collusion between Evans and Hanley. The trial court denied the motion to set aside the default and subsequently entered judgment for plaintiff. Upon appeal defendant Cook contended among other things that the court erred in refusing to set aside the default and permit a defense in the action on the merits. The court in considering the alleged error, and taking as admitted by the failure of plaintiff to present any evidence in opposition to the affidavit of defendant Cook, that there had been fraud or collusion on the part of plaintiff, sets out that it was incumbent upon movent to show two things, viz:

1. Excuse for the neglect, and

2. Whether or not the proposed answer disclosed a meritorious defense.

The court then having concluded that there was excusable neglect, proceeded to a consideration of whether the proposed defense was meritorious, i. e., it proceeded to determine whether the proprietor of an establishment could maintain an action for money won by it at one of its duly licensed games. The court then held that there had been an adoption of the applicable portions of the Statute of Anne.

We have given this case serious and detailed attention by reason of the vigorous contention of appellant that the Statute of Anne so far as applicable to that situation, was not effectually adopted, by reason of the supposed adoption being dicta and not essential to a determination of the matter before the court. In support of this contention counsel cites, 14 Am.Jur. 291, sec. 79, note 4; 14 Am.Jur. 293, sec. 79, notes 7 and 8; Nichols v. St.

Louis and S. F. Railway Co., 227 Ala. 592, 151 So. 347, 90 A.L.R. 842. We have no quarrel with the proposition that if the pronouncement of adoption were dicta, such pronouncement could have no controlling force. However, how could the court determine whether or not the defense was meritorious without considering squarely the question of collectibility of an account representing winnings by the house at a duly licensed game? To determine this precise question the court held that a suit could not be maintained to collect such an account because of the adoption of the pertinent sections of the Statute of Anne. We do not understand this contention of appellant to indicate a belief that the court could have found the account to be uncollectible for other reasons, although such contention, quite logically, could lead to that result.

For the reasons given we have no doubt that the declaration by this court in Evans v. Cook, supra, to the effect that the applicable portions of the Statute of Anne, had been adopted, was essential to a determination of the action, and the court so holds.

In Burke & Co. v. Buck, 1909, 31 Nev. 74, 99 P. 1078, 22 L.R.A., N.S., 627, 21 Ann.Cas. 625, decided under the statute of 1879, the uncontroverted evidence showed that Buck while playing roulette at a Goldfield saloon, endorsed and delivered a negotiable certificate of deposit of $500 back to the house. Buck then notified John S. Cook and Co., the issuing corporation, that he had lost possession of same, without consideration and requested said company to refuse payment of said certificate. Judgment was for plaintiff, the gambling house proprietor, in the trial court and upon appeal reversed. The opinion refers approvingly to Evans v. Cook, supra, and approves the adoption of all parts not inconsistent, of the English Statute of Anne. Again there is a declaration as in Scott v. Courtney, supra, that the licensing of gambling is merely permissive, and serves to give immunity from criminal prosecution and nothing more.

In Menardi v. Wacker, 32 Nev. 169, 105 P. 287, 288, Ann.Cas.1912C, 710, it was held that "A check given for a gambling debt is void under the law of this state, and, there being no valid obligation, there could be no lawful consideration for the security as a pledge." Citing Burke & Co. v. Buck, 31 Nev. 74, 99 P. 1078, 22 L.R.A., N.S., 627, 21 Ann.Cas. 625.

Looking at the matter historically and by way of throwing light upon the question of legislative intent, it is deemed fitting to show that in or about the year 1909, the pendulum of public opinion had reached the extreme right, and from 1909 through 1915 a series of anti-gambling statutes were enacted. Sufficient to conclude without going into great detail that this was a period of extreme conservatism in the public policy of the state with reference to gambling. This attitude was first manifested by a statute of 1909, p. 307, entitled; "An Act prohibiting gambling, providing for the destruction of gambling property and other matters relating thereto." See also, Statutes of 1911, pp. 423, 424, 426, 429, 432, 435, 440, and 441; Statutes of 1913, p. 235; and Statutes of 1915, pages 31 and 462.

Public opinion having changed again toward liberality the legislature enacted the so-called open gambling law in 1931. The statute is entitled: "An Act concerning slot machines, gambling games, and gambling devices; providing for the operation thereof under license; providing for certain license fees and the use of the money obtained therefrom; prohibiting minors from playing and loitering about such games; designating the penalties for violations of the provisions thereof; and other matters properly relating thereto." Statutes of 1931, 165–169, secs. 3302–3302.16, N.C.L. Supplement 1931–1941. From this statute we quote from three pertinent sections, viz:

"Section 1. From and after the passage and approval of this act, it shall be unlawful for any person, firm, association or corporation, either as owner, lessee, or employee, whether for hire or not, to deal, operate, carry

on, conduct, maintain, or expose for play, in the State of Nevada, any game of faro, monte, roulette, keno, fan-tan, twenty-one, black jack, seven-and-a-half, big injun, klondyke, craps, stud poker, draw poker, or any banking or percentage game played with cards, dice, or any mechanical device or machine, for money, property, checks, credit, or any representative of value; or any gambling game in which any person, firm, association or corporation keeping, conducting, managing, or permitting the same to be carried on, receives, directly or indirectly, any compensation or reward, or any percentage or share of the money or property played, for keeping, running, carrying on, or permitting the said game to be carried on; or to play, maintain, or keep any slot machine played for money, for checks or tokens redeemable in money or property, without having first procured a license for the same as hereinafter provided; and provided further, that no alien, or any person except a citizen of the United States, shall be issued a license, or shall directly or indirectly own, operate or control any game or device so licensed.

"Sec. 2. Third—Said license shall entitle the holder or holders, or his or their employee or employees, to carry on, conduct, and operate the specific slot machine, game or device for which said license is issued in the particular room and premises described therein, but not for any other slot machine, game or device than that specified therein, or the specified slot machine, game or device in any other place than the room and premises so described, for a period of three (3) months next succeeding the date of issuance of said license; provided, that the licensee shall be entitled to carry on, conduct and operate two or more slot machines, games or devices mentioned in section one of this act, in the same room, by paying the license herein provided for, for each slot machine, game or device and otherwise complying with the terms of this section.

"Sec. 5. All moneys received for licenses under the provisions of this act shall be paid, twenty-five (25%)

per cent to the state treasurer for general state purposes, and seventy-five (75%) per cent to the county treasurer of the county wherein the same is collected for general county purposes; provided, where the license is collected within the boundaries of any incorporated city or town the county shall retain twenty-five (25%) per cent of said moneys, and the incorporated city or town shall receive fifty (50%) per cent of said moneys so collected, and the same shall be paid into the treasury of said incorporated city or town for general purposes; provided further, where the license is collected within the boundaries of any unincorporated city or town that is under the control of the board of county commissioners under and by virtue of an act entitled 'An Act providing for the government of towns and cities of this state,' approved February 26, 1881, the county shall retain twenty-five (25%) per cent of said moneys, and fifty (50%) per cent of said moneys so collected shall be placed in the town government fund for general use and benefits of such unincorporated city or town."

Section 5, above quoted, was amended in the legislative session of 1945, p. 492, but in a manner not material to the purpose for which the section is cited. In this statute of 1945, p. 492, a new section was added entitled, "section 10e," which section reads as follows:

"Section 10e. The Nevada tax commission, before issuing a state gambling license shall charge and collect from each applicant a license fee equal to one (1%) per cent of all the gross revenue of such applicant exceeding three thousand dollars ($3,000) quarterly.

"No state gambling license shall be issued to any applicant until the license fee, if any, has been paid in full."

The legislature of 1947 changed this section in certain details but no change of the statute is pertinent to this opinion except the fact that the percentage was increased from one percent to two percent.

See Statutes of Nevada of 1947, p. 734.

Appellant as a result of tireless and exhaustive

research shows to the court that a great deal of the gambling law of England in force at the time of the American Declaration of Independence, is peculiarly applicable to that country because of the structure of their government. From this he argues that under our form of government and particularly in view of the liberality of our statutory enactments pertaining to this subject, from the year 1931, no part of the said Statute of Anne can now have any controlling force. In support of this position appellant shows:

That by Statute 33, Henry VIII c. 9, enacted A.D. 1541, in England, it was made unlawful to maintain a house or place of dicing, table or carding, or other gambling;

That by section 12 of said act all other gambling statutes were repealed;

That by Statute 10 and 11, Will. 3 C 17 (c), enacted 1710, lotteries were declared common nuisances;

That under Statute 8, George 1, c. 22 S.S. 36, 37, enacted 1721, further penalties for conducting lotteries were provided and certain other enforcement provisions were provided;

That under Statute 9, George 1, c. 19, enacted 1722, certain prohibitions against foreign lotteries were provided;

That the said Statute of Anne was enacted for the purpose of implementing and enforcing the previous anti-gambling statutes;

That said statute contained a limitation or exception to its operation by express terms by provision that it should have no force or effect within His Majesties Royal Palaces, etc. M, and otherwise excepting the sovereigns;

That by Statute 4, George IV, c. 60, secs. 1–18, a treasury lottery was authorized;

That by section 2 of the Statute of Anne, any person who had lost at gaming, could within three months maintain an action of debt, and recover said sum with costs, and in the event the loser failed to commence such an

action same might be maintained by any one for treble the amount lost plus costs;

That section 5 of said act provided for corporal punishment to a person winning by fraud;

That the Statute of Anne does not, as do the Nevada statutes, license gambling;

That said statute expressly permits unlicensed gambling in the royal palaces under certain conditions;

That said Statute of Anne permits unlicensed gambling by the royal family "for ready money only," while the Nevada statutes permit gambling not only for money but for "property, checks, credit, or any representative of value."

We understand that certain of the statutes of England, not here under investigation, but which cast light upon the gambling status and public policy of England at that particular time, are discussed only for these purposes.

Certain portions of the Statute of Anne that are at hopeless variance with the structure of government in America, were equally at hopeless variance at the time of the admission of Nevada to statehood. Admittedly, without attempting to define just which portions, certain portions of the Statute of Anne are not in harmony with the structure of government here, either national or state. But from this fact we cannot conclude that no part of the statute has been adopted unless the statute itself is totally inseparable, or nonseverable. Apparently this question of severability has not been raised or urged in any of the gambling cases heretofore decided by this court. Such contention therefore merits careful consideration. 34 L.R.A. 341, footnote "n."

The determination of Evans v. Cook, supra, and Burke v. Buck, supra, elicited the declaration that the first section of the Statute of Anne had been adopted. The wording of the first section alone was required to sustain the conclusion reached. The first section of said statute reads as follows:

"That all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever given,

granted, drawn, or entered into, or executed by any person or persons whatsoever, where the whole, or any part of the consideration of such conveyances or securities shall be for any money, or other valuable thing whatsoever, won by gaming or playing at cards, dice, tables, tennis, bowls, or other game or games whatsoever, or, by betting on the sides or hands of such as do game at any of the games aforesaid, or for the reimbursing or repaying any money knowingly lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever."

The first section heretofore quoted, provides that gambling debts may not be collected at law; the second section that money lost at gambling and paid over may be recovered by the loser and the ninth section is a proviso declaring that nothing in the act shall prevent gambling at the palaces of St. James, or Whitehall when the sovereign is in residence and that such gaming shall be for ready money only.

■ The general law on the subject of statutes void or ineffectual in part, is clear:

"* * * the adjudging of a certain portion of a statute to be unconstitutional does not affect any other portion, save and except so much thereof as is dependent upon that portion which is declared null and void." Ex parte Arascada, 44 Nev. 30, 189 P. 619, 621; Ex parte Goddard, 44 Nev. 128, 190 P. 916.

■ The first and second sections of the statute are entirely independent and severable. The first provides a shield for one who has lost at gambling but has not paid his losses, while the second provides a sword by which he may recover back what he has paid over. The first provides a defense and the second a remedy. It is difficult or impossible to conceive of a single transaction in which both sections could be invoked. The first section cannot be invoked if the gambling debt has been

paid. The second section cannot be invoked if the gambling debt has not been paid. The first section is not dependent upon the ninth section. As heretofore stated the ninth section is a proviso to the effect that nothing in the act shall prevent gambling at certain palaces for ready money. The first section does not prohibit gambling at these palaces or elsewhere nor does it prohibit or require play for ready money only. On the other hand, the ninth section does not purport to legalize gambling debts but by its express terms requires that gambling at Whitehall and St. James palaces shall be for cash only. What has heretofore been stated as to the effect and severability of the first and second sections applies with equal force to the first and ninth. There could be no single transaction under which both sections could be invoked and either section can be dropped from the act without affecting the rights or defenses conferred by the other.

■ Only such portions of the common law as are applicable to our conditions, have been adopted as the law of this state. Reno Smelting, Milling & Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L.R.A. 60, 19 Am.St.Rep. 364; Haggin v. International Trust Co., 69 Colo. 135, 169 P. 138, L.R.A.1918B, 710. In Esden v. May, 36 Nev. 611, 135 P. 1185, the court held that only those portions of the Statute of Anne are in force which are applicable to our conditions and not in conflict with our statutory law, and that particularly the Nevada statutes governing matters of practice control when in conflict with portions of the Statute of Anne. This court having held that not all of the sections of the Statute of Anne have been adopted, Esden v. May, supra, and having held on three occasions, Evans v. Cook, supra, Burke v. Buck, supra, and Mendardi v. Wacker, supra, that the first section of said statute is the law of this state, under the rule of stare decisis, the contention of appellant that the statute is nonseverable can hardly meet with serious consideration. 21 C.J.S., Courts, sec. 187; p. 302. We are satisfied that there has been an

effectual declaration of adoption of the first section of the Statute of Anne. We are not required to decide if more was adopted and without limiting such possibility we pass the matter for future determination in a proper case.

We are now confronted with the question of whether any of the gambling statutes enacted from the date 1931, have in legal effect repealed by implication the first section of the Statute of Anne. Such repeal would necessarily be by implication for there is nothing in any of the statutes repealing it directly, i. e., there is no provision in any of the statutes to the effect that money won by the establishment at a licensed game may be collected by suit at law.

We have quoted the statutes rather fully and particularly to show that the present law was modeled after the earlier acts of 1869 and 1879, the principal changes being the imposition of a tax upon gross receipts, a grant to the state tax commission of certain regulatory powers, and the legal effect of operating with license. As heretofore mentioned a license under the act of 1869 "shall protect the licensee and his employer or employers (employee or employees) against any criminal prosecution for dealing or carrying on the game mentioned * * *." The statute of 1879, p. 114 is of the same wording in this respect. Under the statute of 1931, p. 165, "Said license shall entitle the holder or holders, or his or their employee or employees, to carry on, conduct, and operate the specific slot machine, game or device for which said license is issued * * *."

Appellant's contention for a repeal by implication is based particularly upon three points, viz;

1. That the use of the word "checks" in the statute of 1931 impliedly authorizes suit to collect same.

2. That the statute of 1931 in omitting the immunity clause contained in the earlier statute did so with the intent of giving authority to the licensee to maintain an action for winnings of licensed games.

3. That if the repeal of the first section of the Statute

of Anne was not effected by the act of 1931 it nevertheless was effected by the act of 1945, p. 492, under the terms and provisions of which it is urged "the state became a partner."

■ In all of the statutes under scrutiny, 1869, 1879, 1931, in which gambling under license is authorized, the word "checks" appears. It is not new to the statute of 1931, which statute is clearly modeled from the other statutes. The first section deals with the unlawful and is prohibitive rather than permissive. In effect it declares that it is unlawful for all persons, natural or artificial, to carry on certain games of chance, enumerating them, for property of all kinds unless properly licensed. It cannot be legally inferred from this wording of the statute that the statute is a grant of authority to take checks in properly licensed games, and that there is a corollary power granted to maintain an action at law for the collection of such checks.

■ What is the legal significance of the omission of the immunity clause, that is, the clause in regard to immunity from criminal prosecution? The inclusion of the immunity clause in the earlier statutes was entirely unnecessary to protect a licensed gambling operator from criminal prosecution, for when a license tax is imposed upon a particular form of gambling or gambling device, one who pays the tax cannot be prosecuted for gambling, i. e., that which is contemplated by the license. State v. Moseley, 14 Ala. 390; State v. Allaire, 14 Ala. 435; Rodgers v. State, 26 Ala. 76; Hawkins v. State, 33 Ala. 433; Overby v. State, 18 Fla. 178; Berry v. People, 36 Ill. 423; State v. Duncan, 84 Tenn. 79; Houghton v. State, 41 Tex. 136; Miller & Co. v. Stropshire, 124 Ga. 829, 53 S.E. 335, 4 Ann.Cas. 574, 575, and note; 27 C.J. p. 1014, sec. 179, notes 59–50, 38 C.J.S., Gaming, sec. 82; 24 Am.Jur. p. 405, sec. 10, note 19.

■ It has been urged that the purpose of including such clause in the statutes of 1869 and 1879, was, as held in Scott v. Courtney, supra, to limit and restrict the effect of the license to simple protection of the persons

so engaged in gambling against criminal punishment, and that to omit such immunity clause from the statute of 1931, is in legal effect to remove the disability enunciated in Scott v. Courtney, supra. This could have been the intent but this possibility is surely discounted or discredited when one reflects that the effect of the license is still limited under the statute. Under the earlier statutes the license protected the licensee from criminal prosecution. Under the present statute the license "shall entitle the holder or holders, or his or their employee or employees, to carry on, conduct and operate the specific slot machine, game or device for which said license is issued * * *." It is the opinion of the court that the substitution of another limiting clause for the former immunity clause cannot have the effect urged by counsel. Who can say but that the omission of the immunity clause was for the purpose of removing surplusage.

█ But to resolve this question of repeal by implication, we are not required to indulge in speculation, we can reach it very directly. We quote from 15 C.J.S., Commerce, sec. 12, p. 620, as follows:

"Although the common law may be impliedly repealed by a statute which is inconsistent therewith, or which undertakes to revise and cover the whole subject matter, repeal by implication is not favored, and this result will be reached only where there is a fair repugnance between the common law and the statute, and both cannot be carried into effect."

The statute of 1931 did not attempt to "revise and cover the whole subject matter," as evidenced by the fact that section 10201 N.C.L. of 1929, which was a law with reference to gambling effective January 1, 1912, was amended in 1941 p. 64; Sec. 10201, 1931–1941 N.C.L. Supplement.

In Cunningham v. Washoe County, 66 Nev. 60, 203 P.2d 611, 613, in which appellant contended for repeal of the common law by implication, Mr. Justice BADT

stated the law applicable to this action at bar in these words:

"Nevada has by statute adopted the principles of the common law and has in a number of instances modified the common law by statutory enactment. That this may be done by way of constructive repeal of the common law (as in cases where a statute has revised the whole subject) or that it may be the result of 'the clear and unquestionable implication from legislative acts,' as maintained by appellant, we may concede to be true where such situations sufficiently appear. However to sustain a justification of the particular acts under this theory, where such acts are not authorized by the express terms of the statute under which the justification is made, we should have to find the plainest and most necessary implication in the statute itself. This rule appears to be frankly admitted even in the authorities submitted by appellant."

We now approach the question of liberal and strict construction.

The law makes a distinction between liquor and gambling industries and useful trades. In State ex rel. Grimes v. Board of Commissioners, 53 Nev. 364, 1 P.2d 570, 572, the court said:

"We think the distinction drawn between a business of the latter character and useful trades, occupations, or businesses is substantial and necessary for the proper exercise of the police power of the state. Gaming as a calling or business is in the same class as the selling of intoxicating liquors in respect to deleterious tendency. The state may regulate or suppress it without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure."

■ Statutes in derogation of the common law are to be strictly construed. Sutherland Statutory Construction, third edition, vol. 3, art. 6202. "* * * statutes granting special privileges to a group of persons who

are in no particular need may be strictly construed against such beneficiaries." Sutherland Statutory Construction, third edition, vol. 3, art. 5503, note 9. "One of the best illustrations of such legislation is laws granting special franchises and privileges." Charles River Bridge v. Warren Bridge, 11 Pet. 420, 36 U.S. 420, 9 L.Ed. 773.

■ Considering the limitations placed by law upon the license, the special class of industry licensed and its deleterious effect, the fact that it is in contravention of the common law, the fact that it is a statute granting special privileges, we entertain no doubt but that the statute is one meriting strict construction against the licensee, and must therefore conclude from the application of the rule of strict construction, that the omission of the immunity clause in the statute of 1931, does not in legal effect grant the right to maintain an action for winnings at a duly licensed game. There is no such "clear and unquestionable implication from legislative acts." In Ex parte Pierotti, 43 Nev. 243, 184 P. 209, 211, Mr. Justice SANDERS speaking in opposition to judicial construction to nullify the obvious meaning of a statute said: "It is not the province of courts to confound by construction what the legislature has made clear."

Finally does the fact that the state now accepts two percent of the gross income from duly licensed games, confer the right upon the licensee of such games to maintain an action for his winnings at such games?

■ It has been urged that such license fee in which the state has this direct interest, confers such right by operation of law. Under the statutes of 1869 and 1879 the state and county both had a financial interest in the proceeds of the license. Under the present law the state receives far more money, of that there can be no doubt, but the financial interest of the state and county has been present under all of the gambling statutes. It might be said that under the earlier laws the interest of the state was in licensing and nothing more, and that

the state was not concerned with the success of the licensed games. In a restricted and limited sense that is true, and yet on the other hand an unsuccessful game could not or would not under the earlier statutes, continue from quarter to quarter to be licensed. It is therefore true that under all license laws the state has been financially interested in the success of the games, machines or devices so licensed. The distinction between the application of the old laws and the present law is therefore a distinction of quantity and not quality. We must therefore conclude that the enactment of the laws of 1945, p. 492, and of 1947, p. 734, by which a license fee of one (1%) percent and later two (2%) percent of gross income, was and is charged, does not alter the conclusions formerly reached.

We have carefully studied the other points raised herein by appellant but are convinced that the intent of the legislature is clear, and do not deem other points of contention of sufficient force to merit extended treatment in this rather long opinion.

In view of the conclusions reached it is not necessary for the court to pass upon other contentions raised by respondent, including that contention that the statutes could not have the effect contended for by appellant by reason of the necessity of a properly inclusive title.

Counsel for both sides are to be highly complimented for their tireless search and excellent briefs.

For the reasons heretofore given it is ordered that the judgment of the district court be, and the same is hereby affirmed, with costs.

HORSEY, C. J., and BADT, J., concur.

EATHER, J., being absent on account of illness, the Governor commissioned Honorable D. W. PRIEST, judge of the Third Judicial District, to act in his place.