**HOTEL RIVIERA, INC., Plaintiff,**

v.

**The FIRST NATIONAL BANK AND TRUST COMPANY OF OKLAHOMA CITY, Defendant.**

**No. CIV 82–146–R.**

United States District Court, W.D. Oklahoma.

July 11, 1983.

Robert D. Nelon, of Andrews, Davis, Legg, Bixler, Milsten & Murrah, Oklahoma City, Okl., for plaintiff.

George W. Dahnke and James E. Britton, of Hastie & Kirschner, Oklahoma City, Okl., for defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

Plaintiff and Defendant have both filed Motions for Summary Judgment which have been responded to in briefs in opposition thereto.

The parties agree that the composition of facts enumerated in Plaintiff's and Defendant's briefs are not in material dispute. Accordingly, this Court may assume that there is no evidence which needs to be considered other than that presented by the parties. *Harrison Western Corp. v. Gulf Oil Co.,* 662 F.2d 690 (10th Cir.1981). While the filing of cross-motions for summary judgment does not relieve the court of its obligation to determine whether material factual controversies remain, *Harrison, supra,* it is evident in this case that no facts are in dispute which would preclude the entry of summary judgment.

Apparently the Plaintiff and Defendant have agreed that the choice of law in this case has no substantive consequence. Both Oklahoma and Nevada, the two states which would bear an appropriate relation to the issues have adopted the U.C.C. See Title 12A, Oklahoma Statutes §§ 1–101 et seq. and Nev.Rev.Stat. §§ 104–1101 et seq.

This is an action to recover on a $250,-000.00 cashier's check issued by and drawn upon the Defendant, The First National Bank and Trust Company ("FNB"). The cashier's check was purchased by Richard K. Pemberton on January 5, 1982 and was made payable to him. That same day Pemberton took the check to Las Vegas, Nevada and subsequently endorsed it to the Plaintiff, Hotel Riviera, Inc. ("Riviera").

At the time Pemberton purchased the cashier's check he was employed as Vice President and Oklahoma City Office Manager of the brokerage firm, A.G. Edwards and Sons, Inc. ("AGE"). It is now apparent that the cashier's check represented an intermediate step in an embezzlement scheme which culminated in Pemberton's disappearance on or about January 7, 1982 and his subsequent indictment in this Court and later, his arrest in the State of Georgia. Count II of the indictment charged Pemberton with intentionally devising a scheme to fraudulently obtain money from FNB through a series of acts which resulted in the purchase of the cashier's check. Count III charged Pemberton with fraudulently transferring the cashier's check to

Hotel Riviera. On December 15, 1982 the jury found Pemberton guilty on all four counts of the indictment.

The undisputed facts regarding the issuance, transfer and dishonor of the cashier's check in question here are as follows:

On January 5, 1982 Pemberton caused two AGE checks totalling $480,000.00 to be issued naming AGE customers as payees. Pemberton forged the endorsements of the payees and deposited the checks in his personal account at FNB. At the same time, Pemberton wrote a check on the personal account in order to purchase a $250,000.00 cashier's check payable to Pemberton from FNB. Within a few hours thereafter, Pemberton boarded a plane and flew to Las Vegas, Nevada, arriving at the Riviera on the evening of January 5. Pemberton had been a customer of the Riviera since August, 1981 when he had established a $25,-000.00 line of credit at the gambling casino. Upon his arrival at the Riviera on this night, Pemberton contacted the Riviera evening shift manager, Mr. Cutsaries, to advise him that he had "just sold an oil well" and had a $250,000.00 cashier's check against which he desired to gamble.

Apparently Riviera's shift managers are given authority to make certain credit decisions. Established policy was that persons were not allowed to gamble against cashier's checks unless the validity and amount of the cashier's check were first verified. Shift managers are given the authority to waive this requirement in some instances, although it appears that the waiver of such requirement would ordinarily be limited to the amount of the individual customer's credit line.

Due to the lateness of the hour that Pemberton began to gamble the shift manager, Cutsaries, elected to waive the requirement of prior verification of the cashier's check and permitted Pemberton to gamble against it. This was done by having Pemberton endorse the cashier's check and leave it with the cashier's cage. Again, established policy called for the cashier's check to be held until completion of the customer's stay at the casino. If the player broke even or came out ahead, the check would be returned to him upon his departure. If the player lost, the check would be taken in payment of markers, which are the instruments utilized by the casino to evidence credit extensions to gamblers.

Pemberton gambled at the Riviera dice tables from the time of his arrival late on January 5 until the morning of January 6. Advances to Pemberton by the Riviera were handled in two ways. First, Riviera recorded a cash deposit of $250,000.00 on Pemberton's credit card with the casino and then reduced that deposit on two occasions to reflect two advances of $50,000.00 each in gambling chips to Pemberton. Thereafter, Pemberton executed markers in the amounts of $50,000.00, $38,000.00 and $118,500.00 to evidence additional advances of chips to him. Thus Pemberton's markers and advances totalled $306,500.00 which exceeded the combined total of his credit limit ($25,000.00) and the deposited cashier's check ($250,000.00) by the sum of $31,500.00.

During the early portion of the evening, prior to midnight, Pemberton had substantial winnings. On several occasions the chips were exchanged for cash at the cashier's cage and the cash placed in a safe deposit box in Pemberton's name. The amount which Pemberton had transferred to the safe deposit box is unclear but appears to have been in the range of $50,-000.00 to $100,000.00.

At 7:12 a.m., on January 6, an employee of the Riviera cashier's department contacted FNB to verify the $250,000.00 cashier's check by verifying the name of the payee, the amount, the check number, that no stop orders were outstanding against the check and that the check had not been reported lost or stolen. The FNB employee verified the cashier's check and told the Riviera employee that the check was "okay." The verification was noted on a copy of the cashier's check.

In view of the fact that Pemberton had exceeded the total of his credit limit and the cashier's check, the graveyard shift

manager left orders when he went off duty at 8:00 a.m. on January 6 that Pemberton was not to be allowed access to his safe deposit box until he reduced his debt to the casino to $275,000.00 (his credit limit plus credit for the cashier's check). Therefore, at 10:00 a.m., in the presence of the day shift manager, Pemberton removed $31,-500.00 from the safe deposit box which he paid to the cashier. He also executed a new marker for $18,500.00 and his previously executed $50,000.00 marker was returned to him. The net effect of this transaction was to reduce the outstanding obligation of Pemberton to the Riviera to $275,000.00.

At 11:00 a.m. on January 6 the Riviera endorsed and deposited the $250,000.00 cashier's check in the ordinary course of business. Apparently at approximately 2:00 p.m. on January 6 Pemberton again opened his safe deposit box, at which time he was allowed to empty its contents, believed to be about $100,000.00 cash, and he departed from the Hotel Riviera and Las Vegas. On Thursday, January 7, Pemberton returned to the FNB in Oklahoma City and withdrew $225,000.00 from his account there. From that point until his arrest in Georgia on June 25, 1982 Pemberton's whereabouts were unknown to FNB, AGE and Riviera.

On the afternoon of January 8, 1982 FNB received oral notification that the two AGE checks totalling $480,000.00 which Pemberton had deposited in his account at FNB on January 5 were being returned because the endorsements of the named payees were forgeries.

When the $250,000.00 cashier's check deposited by the Riviera and forwarded through banking channels arrived at FNB on January 12, 1982 it was returned unpaid.

The Plaintiff and Defendant have each set forth a legal theory under which they may prevail.

FNB's argument begins with the general principle that a negotiable instrument which is transferred in payment of a gambling debt is void and unenforceable.[1] *Sandler v. Eighth Judicial Dist. Court,* 96 Nev. 622, 614 P.2d 10 (1980); *Sea Air Support, Inc. v. Herrmann,* 96 Nev. 574, 613 P.2d 413 (1980); *Corbin v. O'Keefe,* 87 Nev. 189, 484 P.2d 565 (1971) (per curiam); *Wolpert v. Knight,* 74 Nev. 322, 330 P.2d 1023 (1958); *Weisbrod v. Fremont Hotel Inc.,* 74 Nev. 227, 326 P.2d 1104 (1958); *West Indies, Inc. v. First National Bank of Nevada,* 67 Nev. 13, 214 P.2d 144 (1950); *Craig v. Harrah,* 66 Nev. 1, 201 P.2d 1081 (1949); *Menardi v. Wacker,* 32 Nev. 169, 105 P. 287 (1909); *Burke & Co. v. Buck,* 31 Nev. 74, 99 P. 1078 (1909); *Evans v. Cook,* 11 Nev. 69 (1876); *Scott v. Courtney,* 7 Nev. 419 (1872).

Although gambling is legal in Nevada, these Nevada Supreme Court decisions have uniformly held that gambling debts are unenforceable based on the determination that Nevada adopted the English common law of gambling as modified by the Statute of 9 Anne, c. 14, § 1.[2]

1. The Court need not address the choice of law question since the parties have conceded that the relevant law in both Nevada and Oklahoma is substantially the same. If applicable, Oklahoma law would yield the same result, for the Oklahoma Supreme Court has held: "An indorsement and delivery of negotiable paper to pay a gambling debt does not make the indorsee a holder in due course and no title passes between the immediate parties." *Brinley v. Williams,* 189 Okl. 183, 114 P.2d 463 (1941).

2. The full text of the Statute of Anne, § 1 (as quoted in *West Indies, Inc. v. First National Bank, supra,* 214 P.2d at 151) states:
"That all notes, bills, bonds, judgments, mortgages or other securities or conveyances whatsoever given, granted, drawn, or entered into, or executed by any person or persons whatsoever, where the whole, or any part of the consideration of such conveyances or securities shall be for any money, or other valuable thing whatsoever, won by gaming or playing at cards, dice, tables, tennis, bowls, or other game or games whatsoever, or by betting on the sides or hands of such as do game at any of the games aforesaid, or for the reimbursing or repaying any money knowingly lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever."

Reasoning that Pemberton's endorsement and Riviera's acquisition of the cashier's check violated the Statute of Anne and that therefore the transfer was void, FNB contends that the cashier's check cannot be enforced and FNB is entitled to summary judgment.

The second tier of FNB's theory is that even if the cashier's check were deemed enforceable, the void nature of the underlying transaction prevents Riviera from attaining holder in due course status and hence subjects Riviera to FNB's personal defenses of fraud and failure of consideration. U.C.C. § 3–306. Under U.C.C. § 3–302(1) a holder in due course is one who takes an instrument for value, in good faith and without notice that the instrument is overdue or has been dishonored or of any defense against or claim to it on the part of any person. Since it is undisputed that Plaintiff Riviera knew that gambling debts are unenforceable under Nevada law, FNB argues that Riviera knew of a defense against the cashier's check and thus cannot be a holder in due course. Section 3–306 delineates the rights of one who is not a holder in due course and provides in part that that person takes the instrument subject to "(c) the defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose;"

In the present action the fact that the cashier's check was obtained by Pemberton through fraud is not in controversy. Further, consideration for the purchase of the cashier's check failed when AGE returned the forged drafts unpaid. Following FNB's course of logic, if Riviera is not a holder in due course and is subject to FNB's defenses of fraud and failure of consideration, FNB is necessarily entitled to summary judgment.

■ However, Riviera approaches this matter from a different perspective. The mainspring of its theory is the general rule that "the act of issuing a cashier's check *binds* the issuing bank to pay the instrument and the bank is not allowed to stop payment on it." *Anderson, Clayton & Co.*

*v. Farmers Nat'l. Bank*, 624 F.2d 105 (10th Cir.1980). A cashier's check is a bill of exchange drawn by a bank on itself, accepted in advance by the act of its issuance, and is not generally subject to countermand. 6 Michie, *Banks and Banking*, Ch. 12, § 13. The rationale for this rule is that a cashier's check circulates in the commercial world as a primary obligation of the issuing bank and is generally regarded as the substantial equivalent of cash. *See, Pennsylvania v. Curtiss Nat'l Bank*, 427 F.2d 395 (5th Cir.1970); *Kaufman v. Chase Manhattan Bank, N.A.*, 370 F.Supp. 276 (S.D.N.Y.1973); *Scharz v. Twin City State Bank*, 201 Kan. 539, 441 P.2d 897 (1968). To allow the bank to stop payment on a cashier's check would be inconsistent with the representations it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks. *See generally, Anderson, Clayton & Co., supra.* In *Anderson, Clayton & Co.*, however, the Tenth Circuit found that the defendant bank's stop order on a cashier's check was justified. A bank customer purchased a cashier's check from the Defendant bank made to the order of a third party payee. There, the defendant bank had been fraudulently induced to issue the cashier's check by the payee and upon discovering the fraud the bank had countermanded the check. The payee could not recover from the defendant bank for its failure to pay the check because the payee itself did not act in good faith. The court stated that because the payee had made fraudulent misrepresentations in connection with the issuance of the cashier's check the payee was not a holder in due course, but noted that even if it was a holder in due course, the bank could assert the fraud defense because the payee had dealt directly with the bank in obtaining the check. In holding that "the strong considerations of public policy favoring negotiability and reliability of cashier's check" (citing *TPO, Inc. v. FDIC*, 487 F.2d 131 (3rd Cir.1973)) were not present in a case where the payee committed the fraud, the court limited the reasoning of their decision allowing the bank's stop order to

circumstances where fraud on the part of the payee is found.

In the case at bar, even though Riviera was the third party to whom the cashier's check was endorsed over by the purchaser-payee instead of the actual payee, Riviera stands in a position parallel to that of the third party payee in *Anderson, Clayton & Co.* In terms of analysis, both are "third parties" and are thus both once-removed from the transaction in which the cashier's check was purchased. Of course there is no suggestion in the present action that Riviera engaged in any fraudulent activity or that it dealt directly with FNB other than to verify the check. Therefore, because the instant case, unlike *Anderson, Clayton & Co.*, does *not* involve an exception to the general rule, Plaintiff contends that the principle that a bank may not stop payment on a cashier's check because it is deemed accepted when issued must govern. Accordingly, it is Plaintiff's position that it is entitled to summary judgment in its favor and that FNB should honor the $250,-000.00 cashier's check.

Keeping in mind its pervasive principle, Riviera also argues that it should prevail after considering FNB's theory. For the sake of argument, Riviera assumes it is not a holder in due course, and then proceeds to illustrate that even if merely a holder, Riviera has a right to recover on the cashier's check.

Under U.C.C. § 3-207(1) negotiation is effective to transfer an instrument although the negotiation is part of an illegal transaction. Therefore even though the cashier's check was endorsed by Pemberton and transferred to Riviera in payment of a gambling debt, the endorsement was effective to transfer title of the instrument to Riviera.

It is Plaintiff's contention that the fact that the transfer was for gambling purposes cannot be raised as a defense by FNB. In defining the rights of one not a holder in due course, U.C.C. § 3-306, discussed previously herein, also provides that "(d) [t]he claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party."

Some elucidation of these two sections is found in the U.C.C. Comments. The Official Code Comment to § 3-306(d), states:

"The contract of the obligor is to pay the holder of the instrument, and the claims of other persons against the holder are generally not his concern.... The provision includes all claims for recission of a negotiation, whether based on incapacity, fraud, duress, mistake, illegality, breach of trust or duty or any other reason."

And the Official Code Comment to § 3-207 provides in part as follows:

"The provision [that negotiation is effective to transfer title to the instrument] applies even though the party's lack of capacity, or the illegality, is of a character which goes to the essence of the transaction and makes it entirely void, and even though the party negotiating has incurred no liability and is entitled to recover the instrument and have his indorsement cancelled ... *where there is actual negotiation, even in an entirely void transaction, it is no less effective.* The policy of this provision, ..., is that any person to whom an instrument is negotiated is a holder until the instrument has been recovered from his possession; and that any person who negotiates an instrument thereby parts with all his rights in it until such recovery. *The remedy of any such claimant is* to recover the paper by replevin or otherwise; to impound it or to enjoin its enforcement, collection or negotiation; to recover its proceeds from the holder; or *to intervene in any action brought by the holder against the obligor.* As provided in the section on the rights of and not a holder in due course (Section 3-306) *his claim is not a defense to the obligor unless he himself defends the action."* (emphasis supplied)

Interpreting this official commentary and applying it to the facts at bar the Plaintiff maintains that Pemberton's en-

dorsement of the $250,000.00 cashier's check to Riviera was effective to transfer the instrument. Although a claimant (Pemberton) could assert the "gambling debt" defense in order to request the bank to stop payment on the check that defense may not be asserted by the obligor (FNB) against the holder (Riviera). FNB's obligation is to pay the instrument according to its terms and thus Plaintiff submits that summary judgment should be granted in its favor.

In response to Plaintiff's course of reasoning Defendant states that despite everything Plaintiff says, Plaintiff is not a holder in due course because it knew that a check in payment of a gambling debt is void and therefore the Defendant's defenses of fraud and failure of consideration may be asserted against it under U.C.C. § 3–306(c). The Defendant does not disregard U.C.C. § 3–207 because it does not argue that the negotiation of the cashier's check was ineffective. Furthermore, FNB states that it is not asserting Pemberton's "gambling debt" defense with respect to the Pemberton-Riviera transfer, in defiance of U.C.C. § 3–306(d).

Instead, FNB maintains that, from an omniscient position, it is merely pointing out the void nature of the transaction and Riviera's knowledge of its void nature which prevent Riviera from becoming a holder in due course. Riviera had notice of a defense against the cashier's check, i.e. Pemberton's "gambling debt" defense, and cannot attain holder in due course status under U.C.C. § 3–302.

Refuting FNB's thesis Plaintiff asserts the ever-present maxim that the bank, acting in its dual capacity as drawer and drawee, accepted the cashier's check upon its issuance. Additionally both parties describe distinguishing characteristics in the cases cited by the opponent such that the case authority would not be relevant in the present action.

The Court has given scrupulous consideration to the well-reasoned arguments presented by Riviera and FNB in an effort to arrive at the appropriate conclusion in this matter. It was determined at a rather early stage that neither party is "at fault" in this situation. It is understandable that FNB would not question Pemberton, as an AGE vice-president, as well as a depositor with whom the bank had dealt for years, when he presented the two AGE checks for deposit in his account and purchased the cashier's check. *See, American Exchange Bank, Collinsville, Okla. v. Cessna,* 386 F.Supp. 494 (N.D.Okl.1974). Likewise, Riviera had dealt with Pemberton on previous occasions and had received at least one FNB cashier's check from Pemberton in payment of gambling debts which FNB honored. Routinely, in an attempt to protect itself Riviera called FNB to authenticate the $250,000.00 cashier's check and was told it was "okay."

In the Court's view the relationship between FNB and Riviera engenders rival equities. Riviera did not deal directly with FNB aside from telephoning the bank to "verify" the check. Riviera accepted the check for value and in good faith. Upon receiving assurance from FNB that the bank had issued the cashier's check to Pemberton and there were no stop orders against it, Riviera permitted Pemberton to withdraw the remainder of the cash in his safe deposit box (believed to be in the amount of $100,000.00) and to depart from the hotel. Certainly Riviera was not a part of the fraudulent activity engaged in by Pemberton. Pemberton's defalcations were unknown to the Plaintiff and thus Riviera had no notice of the fraud and failure of consideration. As far as Riviera was concerned the cashier's check was as good as cash. The contemplated risks which Riviera accepted flowed from the Pemberton-Riviera relationship. Riviera employees were aware that Pemberton could request FNB to stop payment on the cashier's check and Riviera would not have a claim due to the void nature of the transaction.[3] That is the proposition for which

---

**3.** Riviera knew that they ran a risk of unenforceability every time they extended credit or

the Nevada "gambling debt" cases cited by Defendant stand. In relation to the bank, Riviera is an innocent holder of a cashier's check which was fraudulently procured. Nevertheless, because Riviera gambled and made the choice to accept the instrument for value, while conscious of the vulnerability of the transfer, Plaintiff is not perceived as completely chaste in the eyes of the commercial world. The U.C.C. does not afford holder in due course status to Riviera and as a result Riviera may be subjected to valid claims and defenses asserted by other parties. U.C.C. § 3–306.

 After grappling with the competing rationales of the parties the Court concludes that Defendant's Motion for Summary Judgment must be granted. This decision is based on FNB's reasoning as set forth herein, as well as on the sometimes elusive concepts of fairness and equity. The fundamental principle that a cashier's check is deemed accepted when issued is not profoundly disturbed by the ruling here. A bank cannot dishonor its cashier's check which has been indorsed to an innocent holder in due course. However, where the rights of an innocent third party are not involved there is no overwhelming reason to compel a bank to honor its cashier's check without regard to its own valid defenses. *See,* 6 Michie, *Banks and Banking,* Ch. 12, § 15 for a summary of the decisional law; *See also, TPO Incorporated v. F.D.I.C.,* 487 F.2d 131 (3rd Cir.1973). Plaintiff's contention that its classification as a holder in due course is irrelevant because FNB cannot assert Pemberton's gambling defense under U.C.C. § 3–306(d) is misconceived. The fact that Pemberton transferred the cashier's check in payment of a gambling debt and Riviera accepted it as such with knowledge that the transaction was void precludes Riviera from achieving holder in due course status. FNB is simply asserting its own defenses of fraud and failure of consideration which it is able to do under U.C.C. § 3–306(c) be-

cause Riviera is not a holder in due course. *Equitable Trust Co. v. G & M Const. Corp.,* 544 F.Supp. 736 at 746 (D.Md.1982).

Thus, after conscientious consideration of the foregoing the Court hereby determines that the Defendant's Motion for Summary Judgment is granted and the Plaintiff's Motion for Summary Judgment is denied.

---

accepted a check in payment of gambling losses. The fact that their appraisal of the risk was misconceived in this instance may suggest to Riviera and other casinos the need to reassess their odds.