[No. 1761]

J. E. BURKE & CO., RESPONDENTS, *v.* HAMILTON BUCK, APPELLANT.

1. GAMING—GAMING OBLIGATIONS—BILLS—VALIDITY.

> The common law having been adopted in the state, under the common law as to gaming obligations, as modified by St. 9 Anne, c. 14, as found in 4 Bac. Abr. 456, making all bills, securities, etc., given for money advanced during gaming or playing cards, etc., to any person playing, void, a transfer of a certificate of deposit, indorsed during a game of chance, to enable the indorser to secure funds to continue the game, was void, so that the transferee acquired no title, and could not recover thereon as against the indorser.

APPEAL from the District Court of the First Judicial District of the State of Nevada, Esmeralda County; *F. P. Langan*, Judge.

Action by J. E. Burke and others, doing business as J. E. Burke & Co., against Hamilton Buck. From a judgment for plaintiffs, and from an order denying a nonsuit, defendant appeals. **Reversed,** and judgment directed for appellant.

The facts sufficiently appear in the opinion.

*T. L. Foley* and *D. S. Truman*, for Appellant.

*Swallow & Walsh*, for Respondents.

By the Court, SWEENEY, J.:

This is an appeal from a judgment, and from an order denying a motion for a nonsuit. The action was originally brought by the plaintiffs against John S. Cook & Co., a banking institution, to recover the amount of $500 upon a certain certificate of deposit of date May 25, 1907, issued by said banking institution and payable to the order of Hamilton Buck, the defendant above named. The complaint further alleged: "That on or about the 29th day of May, 1907, the said Hamilton Buck sold, assigned, and transferred to these plaintiffs, by proper and legal indorsements, all his rights, title, and interest in and to said promissory note or negotiable certificate of deposit in writing; that on or about the 31st day of May, 1907, the plaintiffs presented said promissory note or negotiable certificate of deposit to the said defendant, and demanded payment thereof; that the said defendant then and there refused to pay the said $500, or any part thereof, and still so refuses to pay these plaintiffs the said sum." The defendant, John S. Cook & Co., appeared in the action, and filed a petition, setting forth that the said Hamilton Buck had on the 25th day of May, 1907, deposited in the bank the sum of $500, in return for which the certificate of deposit had been issued to him; that on the 30th day of May, 1907, the said Hamilton Buck notified the defendant bank that he had parted with said certificate of deposit, and that the same was in the possession of the plaintiffs, or some other person, but that they were not legally entitled to such possession, nor the ownership of the said certificate of deposit, and not to pay the same to the plaintiffs, or anyone except the said Hamilton Buck, and that thereupon payment to plaintiffs was refused. The defendant bank, not claiming any right, title, or interest in the said certificate except as aforesaid, was upon motion permitted to pay the same into court, and the said Hamilton Buck substituted as defendant in the action.

The said defendant Hamilton Buck filed an answer to the complaint of plaintiffs, containing the following denials and allegations: "That he denies that on or about the 29th day of May, 1907, he sold, assigned, and transferred to the plaintiffs, by proper and legal indorsements, all his rights, title, and

interest in and to the said note or certificate of deposit, in writing. Further answering, the defendant says that the plaintiff got possession of said certificate of deposit by fraud and without consideration, and by plying the defendant with intoxicating liquors until he was incapable of understanding, and unable, from the use of intoxicating liquors so supplied to him by plaintiffs, to comprehend or understand the effect of what he was doing, when he parted with possession of the said certificate of deposit which the plaintiffs now hold and keep from him."

Thereafter, by leave of court, defendant Buck filed an amendment to his answer reading as follows: "That if there was any purported consideration for the indorsement and transfer of the certificate of deposit mentioned in the complaint herein from him to the plaintiffs in this action the same was and is an illegal consideration, and one that is against public policy, viz., that while this defendant was so intoxicated and under the influence of liquors, as hereinbefore stated, he gambled at a game of chance then being conducted, operated, owned, and managed by these plaintiffs, in and at a certain saloon known as the Texas Saloon, at Goldfield, Nevada, which said game of chance is commonly known as and called 'roulette,' and if this defendant indorsed, or in any manner transferred, said certificate of deposit to these plaintiffs, the same was done to pay for money he had lost while so gambling with these plaintiffs, or was done to obtain money with which to continue to gamble and play with these plaintiffs at said game of roulette at their saloon and gambling house at Goldfield, Nevada. If said certificate of deposit was transferred to said plaintiffs, or either of them, it was only done by this defendant for said purpose, and none other, and was done with full knowledge of said plaintiffs of such purpose, upon the part of this defendant, and to furnish him with money with which to continue to gamble with them at their said game of roulette, and if any money or other consideration ever passed from either of the plaintiffs in this action to this defendant, it was only given that said game might be continued, and with a full knowledge of the intended use of the same by this defendant, and was only so given with

the belief and intent, upon the part of said plaintiffs, to win the said certificate of deposit, and the money it represented, from this defendant by reason of his said intoxicated condition, and knowledge that he intended then and there to use the same to play at the said plaintiff's game of roulette."

Upon the issues thus made by the foregoing pleadings, the parties went to trial. Upon the conclusion of the testimony offered by the plaintiffs, counsel for defendant interposed a motion for a nonsuit. The motion being overruled, and the defendant not offering any evidence, judgment was entered against him for the amount demanded in the complaint.

The evidence upon the part of the plaintiffs, without conflict, shows the following state of facts: On the evening of the 29th day of May, 1907, the defendant Buck was in a saloon in the town of Goldfield called "The Texas," in which the plaintiffs conducted the gambling game called "roulette." In charge of the game or "wheel" was one Charles Green, a brother of one of the plaintiffs. For about two hours prior to the indorsement of the certificate of deposit in question the defendant Buck had been "playing the wheel" with varying fortune, until he had finally lost about $1,000. After losing this amount of money he indorsed the certificate of deposit in question, and gave it to the dealer, who placed it in the drawer of the roulette table. The certificate was indorsed upon the roulette table with a pen furnished by one of the plaintiffs. Upon the indorsement and delivery of the certificate of deposit there was paid to defendant Buck, upon the said table, the sum of $500 in gold coin, from moneys then being used in the game. At the time defendant Buck indorsed the certificate of deposit the dealer testified that Buck "did not seem to have any more money," but that he was not indebted to the plaintiffs. After the indorsement and delivery of the certificate of deposit, defendant Buck continued to play the game. The dealer testified that "he won for quite a while; won $700 or $800 after he cashed the check, and finally he lost it—lost the amount practically of the check." The dealer later testified that he did not think defendant lost over $400 of the amount of the certificate.

One Cowell, a bartender in the Texas Saloon, testified to

having seen the defendant Buck "playing the wheel," and saw him indorse the certificate, and receive therefor $500 in gold. Upon the question of the furnishing of intoxicating liquor to the defendant we quote from the testimony of this witness as follows:

Q. Where were you at the time this cashing of the instrument was done?   A. Serving an order of drinks at the table.

Q. At the roulette table?   A. Yes, sir.

Q. A round of drinks had been ordered by somebody?   A. Ordered by the game.

Q. Does the game order drinks for the patrons?   A. Yes, sir.

Q. And gives them liquor?   A. Anything they want.

Q. Whatever they want; if they want whisky or liquor, or anything, the house furnishes it to them?   A. Yes, sir.

Q. And they repeatedly at the roulette table, in the course of the evening, call for drinks, don't they?   A. Yes, sir; if anybody wants a drink, they ask the dealer to ring the bell.

Q. And the dealer rings the bell, and gives them all they want to drink, free of expense?   A. Yes, sir.

Q. That was the condition of affairs there that night at the time of the cashing of this certificate of deposit?   A. Yes, sir.

Q. Do you recall serving him any drinks?   A. Yes, sir.

Q. What did you serve him, what did he drink?   A. I think he was drinking Scotch highballs.

Q. That means Scotch whisky and something else?   A. And mineral water.

The foregoing comprises all the material facts presented at the trial.

The contention of counsel for appellant is stated in their brief as follows: "That this transaction is against public policy. That the endorsement was without legal consideration, and hence void, and in law vested no title to this paper in plaintiffs, and that having been given in a gambling or gaming transaction, and for such purpose solely, the nonsuit should have been granted."

The law is well settled in this state, as it is in most, if not all, of the states, that it is a good defense to an action upon a

negotiable instrument to show that the consideration for which it was given was money won by gambling.

This question first came before this court in the case of *Evans* v. *Cook*, 11 Nev. 69, in which case this court, by Beatty, J., said: "Is it, then, a good defense to an action on a promissory note to show that the consideration for which it was given was money won by gambling? As to whether contracts of wager in general were valid at common law, there is some conflict of opinion disclosed by the American cases, but the weight of authority is so decidedly in favor of their validity that I think there ought never to have been a doubt of it. The ancient common law, however, was altered in respect to this matter by numerous English statutes, and it has been held by this court that English statutes, in force at the date of the declaration of American independence and applicable to our situation, are a part of the common law which we have adopted. (*Ex Parte Blanchard*, 9 Nev. 105.) I should have felt some hesitation in coming to this conclusion if the matter had been *res integra;* but I think that, after having been once so determined, the point should not be unsettled, except for very weighty and conclusive reasons, and none such have been suggested in this case. It follows, therefore, that we have adopted the common law upon the subject of wagers as altered by the statute of 9 Anne, c. 14, by the first section of which it is enacted 'that all notes, bills, bonds * * * given * * * by any person or persons whatsoever, where the whole or any part of the consideration * * * shall be for any money or other valuable thing whatsoever, won by gaming, * * * shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever,' etc. (4 Bac. Abr. 456.) This, then, is the law of this state, except so far as it may be controlled by our own statutes; and there is nothing that I am aware of in the laws of Nevada to limit its operations, except for the protection of a bona fide assignee for value of a note or bond, which the statute of Anne makes absolutely void."

In the foregoing decision, the learned judge, now Chief Justice of the Supreme Court of California, only quoted such portion of the statute as was applicable to the case then under

consideration. The statute, however, is much more comprehensive than is indicated in the opinion of Beatty, J., quoted from, and reads as follows: "That all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever given, granted, drawn, or entered into, or executed by any person or persons whatsoever, where the whole, or any part of the consideration of such conveyances or securities shall be for any money, or other valuable thing whatsoever, won by gaming or playing at cards, dice, tables, tennis, bowls, or other game or games whatsoever, or by betting on the sides or hands of such as do game at any of the games aforesaid, or for the reimbursing or repaying any money knowingly lent or advanced for such gaming or betting as aforesaid, or lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever." (9 Anne, c. 14, 4 Bac. Abr. p. 456.)

In view of the evidence disclosed in this case, which shows that this assignment was made at a gaming table, and during the progress of the play, it comes squarely within the statute above quoted, and therefore the consideration is, by the specific terms of the statute, "utterly void, frustrate and of none effect."

See also *Drinall* v. *Movius State Bank*, 11 N. D. 10, 88 N. W. 724, 57 L. R. A. 341, 95 Am. St. Rep. 693; 20 Cyc. 939, 940.

In the case of *Scott* v. *Courtney*, 7 Nev. 419, which was an action to recover the sum of $2,100 won at a game of faro in a public gambling house, this court, in denying the right of recovery, by Lewis, C. J., said: "Is money won at a public gaming table recoverable by action in this state? is the only question raised upon the record. We conclude it is not. * * * At common law all public gaming houses were nuisances, not only because they were deemed great temptations to idleness, but also because they were apt to draw together great numbers of disorderly persons. (4 Bac. Abr. 451.) It would therefore seem to follow that money won in such house by the keeper could not be recovered, because everything connected with or growing out of that which was illegal partook of its character,

and was tainted with its illegality.  So gaming, which might be innocent itself if carried on elsewhere, would become illegal by being conducted in a place which was condemned by the law.  This is an undoubted principle, applicable, not only to cases of this nature, but all cases of analogous character. * * * Does the statute of this state, then, licensing gaming change the old law in this respect?  We think not,  The statute does not pretend to do more than to protect the keepers of public gaming houses from criminal prosecution when a proper license is procured.  Section 2, declaring that 'The said license shall protect the licensee and his employee or employees against any criminal prosecution for dealing and carrying on the game mentioned,' thus appearing to restrict the effect of the license to simple protection of the persons engaged against punishment, and leaving gaming houses in all other respects precisely as they were formerly, civilly subject to all the disapprobation and restrictions of the common law."

The statute making void a transfer of a negotiable instrument at the time and place of such play, to any person so gaming, or during such play, and the facts of this case showing that the certificate of deposit in question was transferred during the progress of the play at such a time and place, no valid transfer of the certificate was effected, and hence the plaintiffs acquired no legal title thereto.

The judgment of the lower court is reversed, and said court is ordered to enter a judgment in favor of the defendant, to the effect that he is entitled to the money now on deposit with the clerk of said court in said cause.