EUGENE B. WOLPERT, Appellant, *v.*
RALPH KNIGHT, Respondent.

No. 4108

October 24, 1958.                    330 P.2d 1023.

*Jon R. Collins,* of Ely, for Appellant.

*E. R. Miller, Jr.,* of Ely, for Respondent.

## OPINION

By the Court, Badt, C. J.:

Knight recovered a judgment for $2,000 against Wolpert on his complaint based on Wolpert's check for $2,500 issued and delivered by Wolpert to Knight to take up five earlier $500 checks. Wolpert pleaded as a special defense that the check was given in consideration of a gambling debt. The court's finding against this contention is amply supported by the record, which, without contradiction, shows that on each of four occasions at which Knight cashed Wolpert's $500 check, Wolpert was not indebted to Knight. A fifth $500 check was executed by Wolpert at the gambling table and delivered

to the dealer for which the dealer gave Wolpert $500 in chips which Wolpert proceeded to play at the table.

The contention presented on Wolpert's appeal from the judgment is that the $2,500 check, as well as all of the earlier $500 checks taken up thereby, were nullities by reason of the provision that any such bill, note or security given "for the reimbursing or repaying any money knowingly lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate and of none effect * * *." Statute of Anne, Sec. 1, adopted into the law of this state as part of the common law of England. West Indies v. First National Bank, 67 Nev. 13, 214 P.2d 144. Our conclusion is that the contention is not well founded, and we turn to the record to determine the circumstances under which each check was cashed.

Respondent operated the Townclub, a cafe, bar and casino, in Ely. On four different occasions, over a period of three days, appellant went to the cashier's desk at the Townclub and asked if they would cash his check. On each occasion he did so. Knight was asked on cross examination: "Q. Isn't it true, Mr. Knight, when Mr. Wolpert would gamble and come back, or he would build up a debt, then you would give him more money? A. That is not true. Q. Now the money he got from you for the checks, he would use it for gambling? A. No, sir, he would not. That is not a true statement. I say Mr. Wolpert used part of it for gambling but how much I don't know. * * * When he got money from me, at times he would go to the bar and drink or buy drinks at the bar for others, then he would leave and I presume go to the corner for awhile, then come back. * * * Q. Isn't it true you gave him money so he would gamble? A. I did not, that is not true. Q. He did gamble? A. That is right, I saw him gamble but I did not know he would gamble, I thought there was a possibility he would, but I had no way to control that he would."

On each occasion when Wolpert asked Knight to cash his check he owed Knight no money at all. On the last occasion Wolpert bought $500 in chips. It was for this

item of $500 that the court denied him a judgment. Knight further testified: "Q. What did he do with the cash you gave him? A. Mr. Wolpert did several things with the money, he bought drinks for the house, gave money to his friends, to the best of my knowledge he spent money on girls, then he left my place of business. * * * He gave money to his foreman, Fred Harkreader, and to Bill Miller. I would say between $75 and $100 to each. I saw him put his hands in his pockets and I saw him pull out money, how much I don't know. I saw him give money to a girl, and what he did with the money outside of my establishment, I don't know, but I assume that he spent the money because he came back later and cashed another check. On one, two or three occasions he went to the [gambling] table. On several occasions he had discussions with his friends before going back to the tables. I have no way of telling whether he won or lost money in my place of business. Part of the chips [for which the last $500 check was given] he gave to Bill Miller and Fred Harkreader, cashing the chips for silver. I cash payroll checks in my place. I have a cashier stand where these checks are cashed. This is separate, by itself, and handled by a cashier. * * * I would say that Wolpert spent part of the time gambling, I don't know how you would say which part, as he was in and out of the place. He did not stay in my place for a long period of time without moving out. * * * He is the type of man that likes to spend money and put on a big front. He is the type of person that buys drinks for the whole house, gives money away, he would gamble, discuss large sums of money to impress people present; it wouldn't take him long to spend money. * * * It is not true that part of the money that Mr. Wolpert received from cash was for gambling. Out of the first $500 check he might have used $20, I don't know, how much he used of the $500, I don't know, maybe he used $20 or $25, I don't know. Some of the money was used for gambling."

Ann Finley, who was the cashier at the Townclub, testified that Wolpert came to the cashier's window and wanted to cash a check for $500. "I am authorized to cash checks but I also get Mr. Knight's authorization for

those checks, so I went and got Mr. Knight and he came to the cashier's cage. He gave him $500. I saw Mr. Wolpert cash checks three times. He would get his money and go to the bar, buy drinks and has given away money, given money to people and gone to the gambling tables and then gone out of the establishment, he moved around, kind of back and forth."

Appellant contends that the present appeal is governed by the case of Burke & Co. v. Buck, 31 Nev. 74, 99 P. 1078, 22 L.R.A., N.S., 627. There Buck, after losing about $1,000 at roulette, endorsed a negotiable certificate of deposit at the table and delivered it to the dealer who placed it in the drawer of the roulette table. The dealer gave him $500 in gold coin, with which Buck continued to play, eventually losing it all. The court held that the assignment "was made at a gambling table and during the progress of play" and therefore came squarely within the Statute of Anne, citing Evans v. Cook, 11 Nev. 69. The court repeated and emphasized the fact that the certificate "was transferred during the progress of the play."

In Craig v. Harrah, 66 Nev. 1, 201 P.2d 1081, 1084, we find a reasonable guide for the determination of cases like the present one. There this court said: "In determining the purpose for which the $500 was advanced, the significance and relevancy of the surrounding circumstances and environment are readily apparent. If the advancement was made in a gambling establishment in full operation, by the proprietor or his agent, to one then, or immediately prior thereto, engaged in gambling and who ran short of money, the game still being in progress, or if his conversation or the circumstances indicated he intended to resume playing, the purpose of the advancement becomes clear. On the other hand, if the advancement was at a different place than a gambling establishment, or if same was not made at a time when the recipient had been recently playing, and some other, legitimate, purpose is stated by the recipient, then no presumption or inference that the advancement was for a gambling purpose is justifiable from such circumstances."

The trial court was justified in using the foregoing for its guide. This it apparently did, and the evidence supported its findings and judgment.

Affirmed.

EATHER and MERRILL, JJ., concur.