DESERT PALACE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8531–74.     Filed September 11, 1979.

*Robert E. Frisch, David W. Bernstein,* and *Victor F. Ganzi,* for the petitioner.

*Lawrence G. Becker,* for the respondent.

OPINION

IRWIN, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year ended | Deficiency |
|---|---|
| Apr. 30, 1967 | $461,793.32 |
| Apr. 30, 1968 | 1,194,270.15 |
| Apr. 30, 1969 | 3,019,061.24 |
| Sept. 30, 1969 | 1,898,022.12 |
| | 6,573,146.83 |

The issues in this case have been severed and the one now presented for our decision is whether winnings from petitioner's customers who gamble on credit must be recognized as income at the time the receivable arises, or subsequently, when it is paid.

If we hold that petitioner must immediately recognize as income winnings from customers who gamble on credit, the parties have stipulated that petitioner is entitled to deductions under section 165[1] or section 166 as follows:

| Taxable period ended | Deduction | Taxable period ended | Deduction |
|---|---|---|---|
| Apr. 30, 1967 | $987,389 | Apr. 30, 1969 | $1,384,806 |
| Apr. 30, 1968 | 1,489,932 | Sept. 30, 1969 | 1,102,598 |

However, we would then have to decide under which section petitioner is entitled to said deductions.

All of the facts relating to this issue have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Desert Palace, Inc. (hereafter DPI), is a Nevada corporation. DPI's tax returns for the taxable years ended April 30, 1967, 1968, and 1969 and the short taxable period ended September 30, 1969 (including an amendment on Form 1120X), were prepared on the accrual method.[2] The returns for the taxable years ended

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.

[2] By stipulating that DPI filed Federal income tax returns for the taxable periods ended Apr. 30, 1967, 1968, 1969, and Sept. 30, 1969, "on the accrual method," respondent does not agree that the accrual method was properly applied by DPI in computing its casino income. Respondent asserts that the manner in which petitioner treated accounts receivable arising from credit granted in the casino

April 30, 1967 and 1968, were filed with the Office of Internal Revenue Service in Reno, Nev. The returns for the taxable year ended April 30, 1969, and the short taxable period ended September 30, 1969, were filed with the Office of the Internal Revenue Service in Ogden, Utah. The filing of a return for the short taxable year was due to the fact that Caesars World, Inc., acquired DPI in the summer of 1969.

DPI was located in Caesars Palace, a building situated on a portion of Las Vegas Boulevard South known as the "Strip." During the period in question, there were approximately 17 hotel-casinos located on or near the "Strip." Within Caesars Palace, DPI operated a hotel and various entertainment, restaurant, and bar facilities. In addition, firms not affiliated with DPI leased space in the building from which they sold various types of merchandise.

Under the laws of Nevada, a properly licensed firm or person may legally operate a gambling casino. During the entire period from August 1, 1966 (when DPI began its operations), to and including September 30, 1969 (the "period in question"), DPI held all licenses and permits necessary to enable it to operate the casino (hereafter Casino) at Caesars Palace Hotel & Casino (hereafter Caesars Palace) in Las Vegas, Nev., including an unrestricted license issued by the Nevada Gaming Commission (hereafter commission). During the entire period in question, DPI did, in fact, operate the Casino.

The principal games played in the Casino were blackjack, dice, roulette, and baccarat. In blackjack, dice, and roulette, Casino customers would make bets using chips,[3] which would be redeemed at the cashier's cage (an area, similar to a tellers, area in a bank, which was adjacent to, and had an opening onto, the gambling area of the Casino) by the Casino for specified sums of money. In each of those games, if the customer won a bet, he

in computing its income for Federal income tax purposes was an incorrect application of the accrual method of accounting. The parties do, however, agree that in its Federal income tax returns for the period in question, DPI correctly applied the accrual method to all income and expense items other than (1) the items which are the subject of the petition in this case, (2) reserves, allowances, or deductions which may relate to items which are the subject of the petition, (3) items which may change because of the resolution of issues which are the subject of the petition, and (4) the treatment of outstanding chips.

[3] After Apr. 1, 1968, a casino was prohibited by regulation 6.090 (subsequently regulation 6.100(1)) of the commission from playing these games for cash. Prior to that date the Casino, and most other casinos in Nevada, played these games with chips because use of chips made operation of the games easier.

would receive additional chips from the Casino, and if the customer lost a bet, the Casino would retain the chips bet by him. The odds on the bets which could be made at these games in most, if not all, instances favored the Casino. In baccarat, bets were made with cash. To the extent the Casino was able to control it, the cash which was used was bills which had been specially soaped to keep them from sticking together.

### Credit Operations

At all times during the period in question, as part of the normal and regular operation of the Casino, DPI extended credit to certain customers of the Casino. The magnitude of the gambling done on credit relative to the overall operation of the Casino is reflected in the following table:

| Period ended | Drop[1] | Total casino accounts receivable[2] | Receivable[2] received at tables other than baccarat as a percentage of drop |
|---|---|---|---|
| Apr. 30, 1967 | $67,501,453 | $16,793,785 | 23% |
| Apr. 30, 1968 | 85,699,051 | 26,273,620 | 23.4% |
| Apr. 30, 1969 | 101,386,646 | 39,443,726 | 22.4% |
| Sept. 30, 1969 | 47,931,742 | 21,436,994 | 30.4% |

[1] The "drop" for any given period was the cash and IOU's (represented by credit slips) taken in by any table, group of tables, or the Casino for that period.

[2] Not including accounts receivable represented by IOU's redeemed by customers during or at the conclusion of play.

Gaming activities in the State of Nevada are regulated by the commission and the Nevada Gaming Control Board (hereafter board). The commission from time to time promulgates formal regulations relating to gaming. During the portion of the period in question prior to April 1968, although regulation 6.030–1(c) and (g) referred to accounting for uncollectible casino accounts receivable, the regulations of the commission did not specify the procedures which should be used by casinos in connection with "credit play." In April 1968, the commission adopted regulation 6.043 governing procedures for "credit play" at various types of gaming establishments, and from that time to the end of the period in question, "credit play" procedures at the Casino were governed by that regulation.

Regulation 6.043 provided five alternate procedures for granting credit in a casino such as the Casino. These procedures were

based upon procedures in use in various casinos at the time regulation 6.043 was originally adopted.

The Casino utilized the following authorized "credit play" procedure (regulation 6.043, par. 3) for baccarat during the period in question: A serialized record would be kept in the game area. All credit transactions involving each player would be kept on that form or in conjunction with a table card which would contain all or a portion of the required information. The required information would be when, where, and in what amount credit was extended. At the end of the shift, accounting day, or other period of time, when play was ultimately concluded by the player, an accounting would be made at the cashier's cage for any indebtedness; that indebtedness would be evidenced by a check or IOU,[4] and a credit slip would be sent to the table.

The Casino utilized the following authorized "credit play" procedure (regulation 6.043, par. 4) for games other than baccarat: A pre-numbered master card would be maintained in the pit area (a grouping of gaming tables) by a representative of the auditing department. The master card would show the name of the player receiving credit and when, where, and in what amount credit was granted. A separate master card would normally be used for each shift. The master card would be supported by a "table card" maintained by the boxman or dealer at each table. The table card would show the name of each player receiving credit and the amount of credit given. The pit boss who authorized a credit would prepare a signed "receipt" in the form of an "advance card," "counter-check," "marker," or "IOU" and would make every reasonable effort to obtain the player's signature on the receipt. The information on the receipt would immediately be transcribed on the master card. If during the course of play or at the end of play, a player paid with cash or chips all or a portion of the sum he owed, the pit boss would return an appropriate amount of customer-signed receipts and the amount and nature of payment would be noted on the master card and the table card. When a player completed playing, any balance due, which would be represented by checks, advance slips, or similar receipt forms, would be delivered to the

---

[4]An IOU signed by a customer in the Casino was in the form of a counter check (i.e., a check form with the name of the bank and the account number left blank). If the Casino inserted the name of a customer's bank and named itself as payee, the IOU could be presented for payment as a check drawn on the customer's bank.

cashier who would send a credit slip to the table. Notation would be made on the master card and on the table card that settlement had been made at the cashier's cage, and the credit slip would be dropped in the box.

The "credit play" procedure used at the Casino during the period in question was identical both prior and subsequent to the adoption of regulation 6.043. Although the "credit play" procedures at the Casino during the period in question were not invariable (exceptions having been made from time to time to meet the desires of particularly valued customers, and changes having been made in the prevailing procedures, resulting primarily from improved technology), the procedures with regard to the vast majority of transactions at the Casino were identical throughout the entire period in question.

When a typical customer first requested credit at the Casino, he was required to provide the credit manager information which would enable the credit manager to verify the credit worthiness of the customer. This information typically consisted of the names of the customer's principal banks and a statement of the maximum amount the customer wished to gamble. Before granting credit, DPI would verify with the customer's banks the customer's normal balances and would inquire of a Las Vegas information clearing service whether the customer had a history of paying, or refusing to pay, gambling debts.

Once the credit check was completed, the customer would be permitted credit up to a specified maximum amount, which would be dependent upon the result of that check and the credit limit requested by the customer. Thereafter, if the customer wished to gamble at the Casino, he could obtain on credit chips (or, if he was a baccarat customer, cash in the form of bills which had been rubbed with soap) up to the amount of his credit limit, plus such additional amounts as the Casino executives in charge might from time to time authorize.

Once a customer was authorized to receive credit, it could be obtained either at gambling tables or at the cashier's cage. If a customer requested credit at a table, he was given chips (or soaped bills at the baccarat tables) in the requested amount, up to his credit limit. At the time of each extension of credit, the amount of the credit would be noted in a master book maintained in the area of the Casino where the customer was playing and on a card at the table at which he was playing. Also, at the

time of each extension of credit, the customer would execute an IOU evidencing the extension of credit. Typically, each request for credit and each corresponding IOU, would be for a sum which was relatively small in relation to the customer's credit limit. If the customer lost the chips and wanted to continue play, he would request additional credit and execute additional IOU's.[5]

A customer's IOU's would be held in the Casino area either until the customer finished play at the particular group of tables at which the credit was extended (i.e., in the dice area or in the blackjack and roulette area) or until a shift changed, or, on particularly busy days, until the end of the day. At that point, the customer's IOU's would be transferred to the cashier's cage. If a customer with an outstanding IOU still had chips when he completed play, an effort, consisting of a request by an employee in the area of the Casino in which the customer had been playing, and sometimes other Casino executives as well, was made to have the customer apply the chips toward a portion of his outstanding IOU's. In some instances, when a regular customer was staying at Caesars Palace for several days, no effort was made to have the customer apply his chips to redeem his IOU's until his stay was ending, but an effort was made at that time. The efforts to have chips applied to redeem IOU's were successful in most, but not all, instances. Therefore, with regard to most customers, the aggregate outstanding IOU's when the customer terminated play, or his stay, would be approximately the same as his net loss during the period of play or the stay. In some instances, a customer who had several outstanding IOU's when his play, or his stay at Caesars Palace, was completed would be asked to execute a new IOU in the total amount of the indebtedness and exchange it for the several IOU's he had previously issued.

When a table transferred IOU's to the cashier's cage, the cage would note receipt of the IOU's on an IOU control sheet (a sheet showing, with regard to each shift, all IOU's received in the cage and all IOU's held in the cage which were paid). The cage would

---

[5]Extensions of credit to a customer at the baccarat table were recorded with buttons placed on the table until the customer left the table. They were also recorded on a master card in the baccarat area. The customer did not sign IOU's while he was playing. When the customer left the table, he would sign an IOU evidencing the outstanding balance of the credit granted to him while he was playing.

also issue to the table a credit slip in the amount of the transferred IOU's.[6] For the management control purpose of determining the efficiency of particular tables, and as required by regulation 6.043 of the commission, this credit slip would be inserted in the "drop" box and included in the revenues of the table. However, for the purpose of determining the win of the Casino as a whole, all items at the table were transferred to the cage at or near the end of each shift (money having been counted in a count room before being delivered to the cage), and the win (or loss) of the Casino was the difference between the chips, cash, and IOU's in the Casino at the beginning of the shift and the chips, cash, and IOU's in the Casino at the end of the shift. This win for the Casino as a whole represented the total Casino revenue for the shift.[7]

If credit was granted at the cashier's cage, the customer would be given chips (or bills for baccarat), and would be required to sign an IOU. No entry was made in a master book or on a table card in the Casino area, and, because there was no transfer of IOU's from the tables to the cashier's cage, no credit slip was issued. Rather, receipt of an IOU was recorded directly on the IOU control sheet maintained in the cage.

During the period in question, 77.63 percent of the credit transactions in the Casino involved credit issued at tables, and 22.37 percent involved credit issued at the Casino cashier's cage. Of the transactions involving credit granted at the Casino cashier's cage, 43.24 percent of those transactions (9.67 percent of the total credit transactions) involved issuances of credit to specifically identifiable customers who were known to employees of the Casino and who DPI believed it could demonstrate obtained chips or cash on credit for gambling purposes.

As frequently as practicable when credit was extended at the Casino cashier's cage, particularly when the customer requested more than minor amounts of cash, a Casino employee would be called to the Casino cashier's cage, and that employee would attempt to escort the customer to a gambling table. Also, the Casino cashier's cage would not issue significant amounts of cash

---

[6]Copies of each credit slip were retained by the cashiers and by the accounting department and became a permanent record of the Casino.

[7]In computing the net income of DPI for book and tax purposes, entries were made to reflect factors believed by DPI to relate to the ability to collect the accounts receivable evidenced by the IOU's (a reserve for book purposes, and elimination until collection for tax purposes). These entries were made, however, after Casino revenues were recorded.

to customers on credit unless the customers were known to be active baccarat players.

There were occasional deviations from the usual credit procedures (all of which DPI believes were permitted by regulation 6.043). For example, some customers disliked having to sign IOU's when they were playing games other than baccarat. For some of those customers, unsigned IOU's were prepared and held in the Casino area until the customer completed play, at which time the customer would be asked to execute IOU's evidencing his entire credit balance then out-standing. Deviations from the usual credit procedures in the Casino occurred in only a small percentage of the total transactions at the Casino (both in number and dollars involved). Efforts were made by DPI to minimize the number of transactions in which there were deviations from normal credit procedures.

No interest was charged by DPI on outstanding Casino account receivable balances and these balances were not secured.

### Nevada Law

A debt incurred for gambling purposes is not enforceable in the courts of Nevada, nor is it enforceable in the courts of any State of the United States. However, in an action for collection, the debtor must raise the defense that the debt was incurred for that purpose. This applies both to the Casino and the customer. In other words, the obligation of a Nevada casino to redeem chips issued to, or won by, customers also is not enforceable in the courts of Nevada or in the courts of any State of the United States.

The Supreme Court of Nevada has held that a debt incurred with credit granted at a gaming table while play is in progress is presumed to be a debt incurred for gambling purposes, and the courts of Nevada have without exception refused to enforce a debt of that type. There is no such presumption as to whether a debt arising from credit granted at a Casino cashier's cage is a debt incurred for gambling purposes. A person attempting to assert that such a debt was incurred for gambling purposes will have the burden of proving that the sums advanced were in fact used for gambling purposes.

In some instances, as part of its collection efforts, DPI has sued people who owed it money as a result of gambling

transactions, and the people have failed to assert that the debt was incurred for gambling purposes. In some of those instances, DPI has obtained judgments against the people who owed it money. DPI has never obtained a judgment against a person who demonstrated that the debt in question arose from a gambling transaction. However, notwithstanding a valid defense to the enforcement of the IOU's, DPI's collection rate on the IOU's was close to 95 percent.

At all times during the period in question, it was the position of the board that any casino which failed to redeem chips issued by it was operating in an unsuitable manner, as that term is used in regulation 5.010 of the commission. This could lead to disciplinary action, including a fine or suspension or loss of the casino's license to conduct gambling operations.

During the period in question, a chip issued at the Casino, or at other casinos in Nevada, would be exchanged by most casinos for their chips and accepted as payment by many merchants in Nevada, including those in Caesars Palace. Those chips would then be redeemed from the other casino or the merchant by the issuing casino. Subsequent to the period in question, many casinos in Nevada stopped accepting chips issued by other casinos in exchange for their own chips, and most, if not all, merchants stopped accepting chips in payment for merchandise.

### Outstanding Receivables

When a customer completed play, or terminated his stay at Caesars Palace, the customer would be asked when he intended to pay the IOU's. If the customer indicated a specific date, his IOU's would be held by DPI until the specified date, at which time the date would be inserted on the IOU and DPI would deposit the IOU with its bank for presentation through the banking system for payment by the customer's bank (the names of the bank and of the payee having been inserted on the IOU's), or the IOU would otherwise be presented to the customer for payment in the manner requested by the customer. If a customer did not specify a date, DPI would immediately deposit his IOU with DPI's bank for presentation through the banking system for payment by the customer's bank.

With regard to most IOU's, DPI treated the IOU as paid (debiting cash and crediting accounts receivable) and DPI's bank gave DPI credit for the amount of the IOU, when the IOU was

deposited with DPI's bank. In some instances, however, DPI did not treat an IOU as paid, and DPI's bank did not give DPI credit for the amount of the IOU, until DPI's bank had been informed that the customer's bank had accepted and paid the IOU. If an IOU which was treated as paid when it was deposited was returned unpaid, DPI's bank would debit DPI's account for the amount of the IOU, and DPI would resume treating the IOU as an account receivable (crediting cash and debiting accounts receivable).

In some instances, a customer would give the Casino a personal check when he completed play. If the customer did not ask that his check be held uncashed, the check would be treated as immediate payment, subject to collection. If, however, a customer asked that a check be held uncashed for a period (at which point the check was called a "hold check"), or a personal check was returned unpaid (at which point the check was called a "returned check"), the check would be treated as an IOU for all purposes. The Casino accounts receivable of DPI at any point of time consisted of all outstanding indebtedness to DPI at that point of time evidenced by IOU's, including hold checks and returned checks, issued in connection with extensions of credit in the Casino.

If a customer did not pay his IOU's within a reasonable period of time, Casino personnel would contact the customer by telephone or in person on one or more occasions, and attempt to obtain payment. If that failed, unless there was a reason (such as death or bankruptcy of the customer) that the Casino decided it would not be fruitful to pursue the customer further, the IOU would be sent for collection to an attorney or collection agency where the customer resided. Although the fact that an IOU (including a personal check) was issued in connection with a gambling transaction was an absolute defense available to the customer, in many instances the attorney or collection agent was able to collect the amount evidenced by the IOU, either because the customer paid it voluntarily or because the customer failed to assert the defense that the debt was incurred for gambling purposes. If the efforts of the attorney or collection agent were not successful, the IOU would be returned to the Casino. Thereafter, either Casino employees would continue to attempt to collect the sum represented by the IOU, or a decision would be

made by the management of the Casino that the IOU was uncollectible.

Records were maintained by DPI for each customer showing the amount of all outstanding IOU's from the customer and indicating the efforts made to collect those outstanding IOU's.

## Accounting Practices

The revenue from the Casino included by DPI for Federal income tax purposes in its gross revenue for a given period was the difference between the cash and chips on hand in the Casino at the beginning and at the end of the period (treating all Casino cash deposited in banks or used for non-Casino purposes as being on hand). Casino accounts receivable were not taken into account in determining income for tax purposes. As a result of this mechanism, DPI did not treat revenues from "credit play" as taxable revenue until the accounts receivable were actually collected. At the time an account receivable was collected, the proceeds of the collection were added to the cash on hand, and thus the full amount of the proceeds of the collection of that account receivable was treated as taxable revenue by DPI.

The table on p. 1045 illustrates the accounts receivable balances of DPI throughout the period in issue and, in addition, indicates the balances of these accounts receivable remaining outstanding as of July 31, 1975.

The revenue from the Casino included by DPI for financial statement purposes (as opposed to income tax purposes) in its overall revenue for a period was the difference between the cash, chips, and accounts receivable, net of a provision for doubtful accounts, on hand in the Casino at the beginning and at the end of the period (treating all Casino cash deposited in banks or used for non-Casino purposes as being on hand). The provision for doubtful accounts represented the estimate of the management of DPI of the ultimate amount of accounts receivable which would not be collected. That estimate was based primarily on an analysis by management or others of the collection history of the Casino, both with regard to its accounts receivable in general and with regard to specific customers. The accumulated provision for doubtful accounts, less writeoffs of bad debts, was shown on the balance sheet of DPI as an allowance for doubtful collections.

The combined financial statements of DPI and an affiliated

### Casino Accounts Receivable

| | Total received during period ended | Apr. 30, 1967 | Apr. 30, 1968 | Apr. 30, 1969 | Sept. 30, 1969 | July 31, 1970 | July 31, 1971 | July 31, 1975 |
|---|---|---|---|---|---|---|---|---|
| **Apr. 30, 1967** | | | | | | | | |
| I O U's and hold checks | $16,793,785 | | | | | | | |
| I O U's and hold checks uncollected | | $2,431,447 | $913,131 | $799,973 | $785,650 | $772,290 | $763,760 | $759,590 |
| Returned checks uncollected | | 304,484 | 257,131 | 244,964 | 238,689 | 236,749 | 234,064 | 227,799 |
| Subtotal | | 2,735,931 | 1,170,262 | 1,044,987 | 1,024,339 | 1,009,089 | 997,824 | 987,389 |
| Total Casino receivables uncollected Apr. 30, 1967 | | 2,735,931 | | | | | | |
| **Apr. 30, 1968** | | | | | | | | |
| I O U's and hold checks | $26,273,620 | | | | | | | |
| I O U's and hold checks uncollected | | | 3,541,074 | 1,298,189 | 1,235,504 | 1,179,884 | 1,154,284 | 1,136,671 |
| Returned checks uncollected | | | 473,545 | 402,065 | 384,124 | 373,044 | 364,360 | 353,262 |
| Subtotal | | | 4,014,619 | 1,700,254 | 1,619,628 | 1,552,928 | 1,518,644 | 1,489,933 |
| Total Casino receivables uncollected Apr. 30, 1968 | | | 5,184,881 | | | | | |
| **April 30, 1969** | | | | | | | | |
| I O U's and hold checks | $39,443,726 | | | | | | | |
| I O U's and hold checks uncollected | | | | 4,419,754 | 1,729,655 | 1,190,890 | 1,103,800 | 1,067,583 |
| Returned checks uncollected | | | | 399,912 | 355,311 | 340,607 | 331,430 | 317,225 |
| Subtotal | | | | 4,819,666 | 2,084,966 | 1,531,497 | 1,435,230 | 1,384,808 |
| Total Casino receivables uncollected Apr. 30, 1969 | | | | 7,564,857 | | | | |
| **September 30, 1969** | | | | | | | | |
| I O U's and hold checks | $21,436,994 | | | | | | | |
| I O U's and hold checks uncollected | | | | | 4,640,492 | 1,434,534 | 1,035,426 | 969,286 |
| Returned checks uncollected | | | | | 198,470 | 153,483 | 140,513 | 133,313 |
| Subtotal | | | | | 4,838,962 | 1,587,967 | 1,175,939 | 1,102,599 |
| Total Casino receivables uncollected Sept. 30, 1969 | | | | | 9,567,895 | | | |

partnership which owned the real estate on which Caesars Palace is located for the fiscal years ended April 30, 1967, 1968, and 1969, were audited by Harris, Kerr, Forster & Co., certified public accountants. In accordance with generally accepted accounting principles, these financial statements included as an asset of DPI the Casino accounts receivable on hand, net of writeoffs and allowances for doubtful collections. Each of the audits by Harris, Kerr, Forster & Co., included a review of the adequacy of the allowance for doubtful accounts at the end of the fiscal year being audited. The combined financial statements of DPI and the partnership for each of those fiscal years were certified without qualification by Harris, Kerr, Forster & Co.

The income or loss of DPI reported on its Federal income tax returns for the taxable years ended April 30, 1967, 1968, and 1969 and its amended Federal income tax return for the short taxable period ended September 30, 1969, before net operating loss deductions, was as follows:

| Year or period ended | Income (loss) | Year or period ended | Income (loss) |
|---|---|---|---|
| Apr. 30, 1967 | ($1,945,721) | Apr. 30, 1969 | $4,439,581 |
| Apr. 30, 1968 | 700,186 | Sept. 30, 1969 | (1,098,740) |

At all times during the period in question, the State of Nevada imposed various license fees upon holders of gaming licenses. These fees included, with regard to the Casino and similar licensees, a quarterly fee based on gross revenues of the licensee. This fee was on a graduated basis, reaching 5½ percent of gross revenues in excess of $40,000. In computing quarterly gross revenues, a casino operator was permitted to include revenues from credit play in gross revenues or to exclude such revenues from gross revenues until the accounts receivable were actually collected.

In preparing its Federal income tax returns for the taxable years ended April 30, 1967, 1968, and 1969, DPI treated outstanding chips as liabilities, and therefore reduced taxable income for the year by an amount equal to any increase in the face amount of outstanding chips or increased taxable income by an amount equal to any reduction in the face amount of outstanding chips. In preparing its Federal income tax return for the short taxable period ended September 30, 1969, DPI did not treat outstanding chips as liabilities, although it had $64,668

in chips outstanding on that date. Therefore, taxable income for that period was increased by an amount equal to the face amount of chips outstanding at April 30, 1969. The face amounts of chips outstanding at April 30, 1967, 1968, and 1969 and September 30, 1969, and the amounts by which taxable income reported by DPI with regard to the taxable years or period ended on those dates was reduced or increased because outstanding chips were treated as liabilities at April 30, 1967, 1968, and 1969, were as follows:

| Year or period ended | Chips treated as a liability at end of year or period | Reduction or (increase) in taxable income for the year or period |
|---|---|---|
| Apr. 30, 1967 | $66,075 | $66,075 |
| Apr. 30, 1968 | 193,750 | 127,675 |
| Apr. 30, 1969 | 127,712 | (66,038) |
| Sept. 30, 1969 | 0 | (127,712) |

Because a holder of a chip may not enforce in the courts of Nevada or any other State of the United States, the obligation of a casino in Nevada to redeem outstanding chips, DPI concedes that, based upon its view of the law applicable to taxability of income from gambling transactions, it was not correct in treating the face amount of the chips outstanding at April 30, 1967, 1968, and 1969 as liabilities.

The issue in this case is the point at which DPI must accrue as income the receivables generated by customers who gamble on credit extended them by DPI, i.e., at the time they arise or when collected. Petitioner contends the application of accrual method accounting for tax purposes requires it not to recognize those receivables as income until collected. Respondent contends otherwise, asserting the receivables are income at the time the amounts they represent are won by the casino, notwithstanding the fact that they are subject to a complete defense in an action brought for their collection.

In support of its position of nonaccrual, petitioner emphatically argues that, with respect to the receivables in question, the "all events" test of section 1.446–1(c)(1)(ii), Income Tax Regs., and the judicial gloss thereon have not been satisfied. The all events test utilizes a two-prong test in order to determine if income should be accrued in any given taxable year. That test states "income is to be included for the taxable year when all the events have occurred which fix the right to receive such income

and the amount thereof can be determined with reasonable accuracy." Sec. 1.446–1(c)(1)(ii), Income Tax Regs. Petitioner contends that while the second element of this test, that the item of income must be determinable with reasonable accuracy, has been satisfied, the first element, that all events have occurred which fix the right to receive the income, has not. Petitioners reasoning in support of this position is simply that gambling debts are unenforceable and since that unenforceability can be asserted as a complete defense to any action by petitioner for collection of the accounts receivable, all events necessary to fix the right to receive the income have not, in fact, occurred. Thus, petitioner argues, it acted properly in not accruing the accounts receivable as income at any time prior to collection.

Despite the legalization of gambling by the State of Nevada, Nevada courts have steadfastly refused to enforce debts incurred for gambling purposes if the debtor has pled and proved that the debt was so incurred. *Scott v. Courtney,* 7 Nev. 419 (1872); *Evans v. Cook,* 11 Nev. 69 (1876); *Burke v. Buck,* 31 Nev. 74, 99 P. 1078 (1909) (Nevada Supreme Court held the debt instrument void); *Craig v. Harrah,* 66 Nev. 1, 201 P.2d 1081 (1949) (defendant failed to carry the burden of proof); *West Indies, Inc. v. First National Bank of Nevada,* 67 Nev. 13, 214 P.2d 144 (1950) (plaintiff-casino denied recovery of $86,000 in gambling debts); *Wolpert v. Knight,* 74 Nev. 322, 330 P.2d 1023 (1958) (defendant failed to carry the burden of proof as to four of the five loans involved). Nor are gambling debts incurred in Nevada enforceable in the courts of any other State in the United States (*Dunes Hotel & Country Club of Las Vegas v. Mayo,* 44 Misc. 2d 439, 354 N.Y.S.2d 62 (N.Y. County Civ. Ct. 1974)). A negotiable instrument issued as payment of a gambling debt has been held void by the Nevada Supreme Court (*Burke v. Buck, supra; Menardi v. Wacker,* 32 Nev. 169, 105 P. 287 (1909)).

Conversely, under Nevada law a casino is under no legal obligation to redeem chips issued to its customers or to pay wagers lost to its customers. *Weisbrod v. Fremont Hotel,* 74 Nev. 227, 326 P.2d 1104 (1958); *Corbin v. O'Keefe,* 87 Nev. 189, 484 P.2d 565 (1971); *Berman v. Riverside Casino Corp.,* 323 F.2d 977 (9th Cir. 1963).

Respondent agrees with petitioner that gambling debts are unenforceable under Nevada law. In a request for supplemental briefs, we posed the question:

> If the Court should reject respondent's theory that the accounts receivable in issue may properly be disassociated from the gambling transactions whereby the borrowed money was lost, should the taxpayer nevertheless be required to accrue the amounts represented thereby as income prior to the receipt of payment?

In briefing this question, the parties were to specifically consider:

(1) Whether the right which DPI has in the receivables is a legally enforceable right under applicable local law at the time the money represented by such borrowing is lost in gambling; and

(2) Whether legal enforceability of such receivables is a necessary ingredient of a fixed right to receive income from them.

In his supplemental brief, respondent stated:

> If the Court should reject respondent's theory disassociating casino accounts receivable from gambling transactions, the taxpayer should not be required to accrue the amounts represented [sic] casino accounts receivable as income prior to the receipt of payment, except to the extent of the casino receivables which were given to the casino at the cage.

Respondent agreed that petitioner's right to the receivables was not legally enforceable under Nevada law and that legal enforceability is a prerequisite to accrual under section 1.446–1(c)(1)(ii), Income Tax Regs.

Respondent's position favoring accrual of the receivables is not so straightforward. He does not deal with petitioner's argument favoring application of the "all events" test, but, rather, argues for application of what he denotes the "two step transaction" theory (step one being the loan transaction, step two being the gambling transaction). Using this theory, respondent would treat the winnings from customers who have received chips on credit the same as winnings from customers who have purchased chips with money borrowed from someone other than petitioner. In other words, respondent would have us deem irrelevant the fact petitioner also happens to be the lender in the loan transaction, thus arguing that the source of the credit used in obtaining the chips used to gamble has no effect on the requirement that DPI accrue as income its winnings from those customers gambling on credit.

Conceding that gambling debts are subject to the defense that they are not enforceable in an action to recover upon them,

respondent attempts to isolate the issuance of chips or cash for the IOU from the gaming transactions which followed, asserting that the winning of chips or cash constitutes the totality of the income-earning process. The problem, as we see it, with respondent's analysis is that it is myopic.

The substance of a gambling transaction is the wagering of something of value on the fortuitous occurrence or nonoccurrence of certain events. In order to make the gambling casino administratively workable, at the time relevant herein, the casinos required that bets be made with chips (except in baccarat). Therefore, a party could not bet goods, services, cash (except in baccarat) or IOU's, although these could normally be proper subjects of a bet. The key is that chips (or cash in baccarat) stand in the place of these other items of value (specifically relevant to the case before us, the chips (or cash) stand in place of IOU's) to provide a uniform medium of exchange. Respondent concedes that if the IOU's were the actual subject of the betting, they would not be accruable. We believe, based on this concession, that the result is the same where the casino receives the IOU's and issues chips (or cash) in order that they be used as the medium of exchange. Expressed another way, we believe, based on respondent's concession,[8] that to the extent a customer's IOU to a casino would be treated by State courts as a gambling debt, and therefore unenforceable, it does not represent accruable income until paid.

A distinction exists, however, between IOU's issued at the gambling tables and those issued at the cages. Unlike table credit, cage credit does not carry a presumption of use for gambling purposes. *Burke v. Buck, supra; Craig v. Harrah, supra; Wolpert v. Knight, supra.* As stipulated by the parties and indicated in the findings of fact, 22.37 percent of the credit extended by the petitioner was cage credit. Petitioner bears the burden of proof that cage credit was actually used by borrowers for gambling. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner's belief that it could demonstrate that certain customers obtained cage credit for gambling purposes does not, by itself, satisfy

---

[8]The problems in this area may be more complex than perceived by the parties. See *Travis v. Commissioner,* 406 F.2d 987, 989–990 (6th Cir. 1969); *Barker v. Magruder,* 95 F.2d 122 (D.C. Cir. 1938); *Herberger v. Commissioner,* a Memorandum Opinion of this Court dated June 28, 1950, affd. 195 F.2d 293 (9th Cir. 1952). See also *Eastman Kodak Co. v. United States,* 209 Ct. Cl. 365, 534 F.2d 252 (1976).

petitioner's burden of proof. Accordingly, petitioner must accrue the cage credit as income at the time of issuance.

*An appropriate order will be entered.*