NATIONAL RECOVERY SYSTEMS

v.

Marvin ORNSTEIN.

Civ. A. No. 80–1755.

United States District Court,
E. D. Pennsylvania.

June 3, 1982.

Melvin Rubin, Ardmore, Pa., for plaintiff.

Marvin Ornstein pro se.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff National Recovery Systems (NRS), as the assignee of claims of the MGM Grand Hotel (MGM Grand) and Caesar's Palace (Caesar's) commenced this suit against pro se defendant Marvin Ornstein to recover the sum of $15,000 which the defendant borrowed from the MGM Grand and Caesar's. The case was tried before the Court on May 3, 1982. For the reasons set forth below, the Court has determined that the obligation is unenforceable and will enter judgment in favor of the defendant and against the plaintiff.

The basis for federal jurisdiction in this case is diversity. NRS is a New York corporation with its principle place of business in New York. NRS acts as a consultant to gambling casinos, in which capacity it, among other things, sets up procedures for gaming, casino credit and the collection of debts. NRS set up the credit and collection procedures for the MGM Grand and modified the procedures used by Caesar's. NRS acts as a consultant for both the MGM Grand and Caesar's. Mr. Ornstein is a citizen of Pennsylvania residing in Pipersville, Pennsylvania.

In October 1975, Marvin Ornstein, who was then residing in New Jersey, submitted a credit application to the MGM Grand in Las Vegas. In January 1976, Mr. Ornstein also submitted a credit application to Caesar's. As a result of these applications, Mr. Ornstein received lines of credit, each in the amount of $10,000, from the MGM Grand and Caesar's. All sums advanced pursuant to the lines of credit were to be repaid within ninety (90) days. On numerous occasions between December 1975 and March 1977, Mr. Ornstein travelled to Nevada on "gambling junkets" and drew upon these lines of credit, using the money for gambling purposes. In each instance, Mr. Ornstein repaid the amount loaned within the 90 day period. However, in April 1977, Mr. Ornstein travelled to Caesar's in Nevada and borrowed from it amounts totalling $8,000.00. The money was advanced in the form of chips which Mr. Ornstein used for the purpose of gambling in Caesar's Casino. In exchange for the money received, Mr. Ornstein executed "counter-checks" or "markers" in the amount of the advance. These counter-checks are blank form checks which the borrower fills in with his name and the name of his bank, as well as the amount of the advance. In May, 1977, Mr. Ornstein repaid $3,000 to Caesar's, leaving an outstanding balance of $5,000. In November, 1977, Caesar's attempted to cash five counter-checks, each in the amount of $1,000 signed by Mr. Ornstein. The checks were returned to Caesar's by Mr. Ornstein's bank because Mr. Ornstein's account did not have sufficient funds to cover the checks. Mr. Ornstein has not repaid the $5,000 balance.

In June, 1977, Mr. Ornstein went to the MGM Grand in Nevada where he borrowed amounts totalling $10,000 over the course of three days. These amounts were also advanced in the form of gaming chips which Mr. Ornstein used to gamble in the MGM Grand's Casino. Mr. Ornstein executed ten counter-checks to the MGM Grand each in the amount of $1,000 and has not repaid any part of the $10,000.

On November 29, 1978, Grand Resorts, Inc. (the corporate name of the MGM Grand) assigned its claim for $10,000 against Mr. Ornstein to NRS. On that same day, Caesar's Palace assigned its claim for $5,000 to NRS. Each assignment provides in part:

NOW, THEREFORE, for valuable consideration receipt of which is hereby acknowledged, the Assignor does hereby unconditionally and irrevocably sell, assign, transfer and set over to the Assignee all the right, title and interest of the Assignor in and to the indebtedness ow-

ing by the Debtor, together with the benefit of any and all security which the Assignor may be holding with respect to such indebtedness, and together with all interest due and to become due thereon.

When NRS was unsuccessful in its attempts to collect the debts, it instituted this action on May 7, 1980. At trial, Mr. Ornstein did not dispute the fact that he had borrowed and failed to repay the sums of $10,000 and $5,000 from the MGM Grand and Caesar's respectively and identified the signatures on the counter-checks evidencing the loans as his own. However, Mr. Ornstein contended: (1) that the amount of each debt standing alone was insufficient to satisfy the amount in controversy requirement of 28 U.S.C. § 1332 and that the claims were assigned to NRS for the purposes of invoking federal court jurisdiction; and, (2) that the loans were made for gambling purposes and that such loans are not enforceable under the law of the State of Nevada.

 It is well settled that a single plaintiff in an action against a single defendant may aggregate all claims which can be joined under Rule 18 of the Federal Rules of Civil Procedure in order to meet the amount in controversy requirement of 28 U.S.C. § 1332. 1 Moore, Federal Practice ¶ 0.97. Aggregation is permissible even where some or all of the claims have come to plaintiff by way of assignment, unless the purpose of the assignment was to invoke the jurisdiction of the federal court. 1 Moore, Federal Practice ¶ 0.77[1] at 947–50. The assignments in this case took place approximately one and a half years prior to the initiation of this action and the court finds that NRS is the sole owner of the claims and that the MGM Grand and Caesar's have relinquished all rights to the claims. There was no evidence that the purpose of the assignments was to invoke this Court's jurisdiction and, based upon the evidence at trial, the Court finds that the assignments were not made for such a purpose and that the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

 Having determined the existence of this Court's jurisdiction, we turn now to the question of the enforceability of the debt. In a diversity action, the conflict of law rules to be applied are those of the forum state. *Melville v. American Home Assurance Company*, 584 F.2d 1306 (3rd Cir. 1978). Pennsylvania conflicts law employs a combination of the "interest analysis" and the Restatement Second's grouping of contacts to determine which state's law shall be applied. *Id.* at 1313. Both parties agree that the law of Nevada governs the question of the enforceability of the debt in this action, and the Court finds no reason to disagree. *See Steaks Unlimited, Inc. v. Deanes*, 623 F.2d 264, 269–70 (3rd Cir. 1980). Although we will forgo a lengthy review of the laws and policies of the states involved, the facts admitted by the parties show conclusively that Nevada has the most significant relationship both in terms of contacts and policy interests as to the transactions. In particular, we find that Mr. Ornstein's credit application was prepared on forms supplied by the MGM Grand and Caesar's, was mailed by him to the MGM Grand and Caesar's in Nevada, the applications for credit were accepted in Nevada, the advances to Mr. Ornstein were made in Nevada and were used for gambling in the respective casinos in Nevada. The counter-checks were signed in Nevada, and the debts were to be repaid to the MGM Grand and Caesar's in Nevada. Furthermore, the assignments were made by the MGM Grand and Caesar's to NRS in Nevada. In addition, we find that the state of Nevada has a substantial interest in having its policies applied to transactions involving or relating to legalized gambling operations carried on within its borders.

 Although the state of Nevada has legalized gambling, the Nevada Supreme Court has consistently held that debts incurred, and checks drawn for gambling purposes, are unenforceable. *E.g., Sandler v. Eighth Judicial District Court*, 96 Nev. 622, 614 P.2d 10, 11 (1980); *Sea Air Support, Inc. v. Hermann*, 96 Nev. 574, 613 P.2d 413, 414 (1980); *Burke v. Buck*, 31 Nev. 74, 99 P.

1078 (1909). The Supreme Court of Nevada has based the above decisions on the State statute of 9 Anne, ch. 14, § 1 which provides in pertinent part:

> That all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever given, granted, drawn, or entered into, or executed by any person or persons whatsoever, where the whole, or any part of the consideration of such conveyances or securities shall be for any money, or other valuable thing whatsoever, won by gaming or playing at cards, dice, tables, tennis, bowls, or other game or games whatsoever, or by betting on the sides or hands of such as do game at any of the games aforesaid, or for the reimbursing or repaying of any money knowingly lent or advanced for such gaming or betting as aforesaid, or lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever.

■ The burden of proving a gambling purpose is on the party seeking to avoid liability, but there is a presumption of gambling purpose where the transaction occurs in proximity to the gambling itself in terms of both time and space. *Flamingo Resort v. United States*, 485 F.Supp. 926, 931 (D.Nev. 1980), *aff'd*, 664 F.2d 1387 (9th Cir. 1982). For instance, in *Craig v. Harrah*, 66 Nev. 1, 201 P.2d 1081 (1949), the Supreme Court of Nevada stated the presumption as follows:

> In determining the purpose [behind the indebtedness], the significance and relevancy of the surrounding circumstances and environment are readily apparent. If the advancement was made in a gambling establishment in full operation, by the proprietor or his agent, to one then, or immediately prior thereto, engaged in gambling and who ran short of money, the game still being in progress, or if his conversation or the circumstances indicated he intended to resume playing, the purpose of the advancement becomes clear. On the other hand, if the advancement was at a different place than a gambling establishment, or if same was not made at a time when the recipient had been recently playing, and some other, legitimate, purpose is stated by the recipient, then no presumption or inference that the advancement was for a gambling purpose is justifiable from such circumstances.

66 Nev. at 6, 201 P.2d at 1084.

■ Based upon the evidence adduced at trial and applying the above-quoted presumption, the Court finds that the loans were made for gambling purposes. Ornstein had received advances from both the MGM Grand and Caesar's on numerous occasions, which funds he used for gambling at their casinos. The daily nature of the advances to Mr. Ornstein during his visits to Caesar's and the MGM Grand, his history of gambling and borrowing at their casinos, and the fact that the advances were made to him in the form of chips in proximity to the gambling activities, are facts which under the law of Nevada clearly support the presumption that the loans were made for a gambling purpose. Since the Court has determined that the loans were made for a gambling purpose, the debts incurred and checks evidencing such debts are void and unenforceable.

In making this determination, we have followed the law of Nevada as set forth in *Sea Air Support, Inc. v. Herrmann*, 96 Nev. 574, 613 P.2d 413 (1980). In *Sea Air Support*, the defendant wrote a check for $10,000 to a hotel casino in Nevada and exchanged it for three counter-checks he had written earlier that evening to acquire gaming chips. When the casino attempted to cash the check, it was returned because the defendant's account had insufficient funds. The debt was then assigned to a collection agency which then filed an action in the Nevada courts to collect the $10,000. In affirming the lower court's dismissal of the action, the Nevada Supreme Court stated,

> . . . this court has long held that debts incurred, and checks drawn, for gambling

purposes, are void and unenforceable [citations omitted].

In this case, [defendant's] $10,000 check clearly was drawn for the purpose of repaying money knowingly advanced for gaming. *See Craig v. Harrah*, 66 Nev. 1, 201 P.2d 1081 (1949). The check is void and unenforceable in this state. If the law is to change, it must be done by legislative action.

613 P.2d at 414.

NRS has attempted to avoid the result mandated by the Supreme Court of Nevada by asserting that while the counter-checks may be void, it should be able to collect on the underlying obligation. In support of its position, NRS cites *Wolpert v. Knight*, 74 Nev. 322, 330 P.2d 1023 (1958) and *Craig v. Harrah*, 66 Nev. 1, 201 P.2d 1081 (1949). However, our analysis of these two cases convinces the Court that the Supreme Court of Nevada makes no such distinction. In both *Wolpert* and *Craig*, recovery was permitted because the court in each case found that the defendant had not established the fact that the monies were advanced for the purpose of gambling. As the Nevada Supreme Court stated in *Sea Air Support*, supra, at 414,

"... this court has long held that debts incurred, and checks drawn, for gambling purposes are void and enforceable.

\* \* \* \* \* \*

If the law is to change, it must be done by legislative action."

MGM Grand, Caesar's and NRS, as a consultant in the gaming field, must have been aware of the odds against obtaining a judgment based upon the indebtedness incurred by Mr. Ornstein during his gambling binges in Nevada; they too gambled and lost. This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). An appropriate order will accordingly be entered.